## COUNTY OF ST. CLAIR v. LOVINGSTON.

1. Where a survey begins "on the bank of a river" and is carried thence "to a point in the river," the river-bank being straight and running according to this line, the tract surveyed is bounded by the river. It is even more plainly so when it begins at a post "on the bank of the river, thence north 5 degrees east up the river and binding therewith."
2. Alluvion means an addition to riparian land, gradually and imperceptibly made, through causes either natural or artificial, by the water to which the land is contiguous.
3. The test of what is gradual and imperceptible is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.
4. It matters not whether the addition be on streams which do overflow their banks or those that do not. In each case it is alluvion.

ERROR to the Supreme Court of Illinois.

The county of St. Clair, Illinois, brought ejectment against Lovingston, for a piece of land within its own boundaries, situated on the east bank of the river Mississippi (as its east bank now runs), opposite to St. Louis. The land was confessedly "made land;" that is to say, it was land formed by accretion or alluvion, in the general sense of that word; though whether it was land made by accretion or alluvion in the technical or legal sense of the word was a point in dispute between the parties in the case. The bank of the river had confessedly, in some way, been greatly changed, and, in this part, added to. The tract in dispute is indicated on the diagram upon the next page, by the deeply shaded or most dark part of it; the part at the bottom of the diagram and on the left hand side of it.

The case was thus:

Before the year 1815, and in pursuance of an early formed intention by the government, to give a piece of land to soldiers in the old French settlements in Illinois, a survey was made in the public lands for one Nicholas Jarrot, of one hundred acres, which was either *on* or near to the Mississippi River, as it then ran; though whether, in all its parts, *on*

the river or only *beginning* on its bank and leaving a strip or pieces of land between the tract and the river—edges more or less ragged—was one point in the case.

DIAGRAM No. 1.

The field-notes and a plot of the tract, as given in proof, were thus:

DIAGRAM No. 2.

West.

East.

"Beginning *on the bank of the Mississippi River*, opposite St. Louis, from which the lower window of the United States storehouse in St. Louis bears N. 70¾ W.; thence S. 5 W. 160 poles *to a point in the river* from which a sycamore 20 inches diameter bears S. 85 E. 250 links; thence S. 85 E. 130 poles (at 30 poles a slash) to a point; thence N. 15 W. 170 poles to a forked elm on the bank of Cahokia Creek; thence N. 85 W. 70 poles to the beginning."

At the time of this survey the west line of the tract, if not in all its course *on* the river, was confessedly in all its course near to the river; the general course of the river-bank in 1814, just before the survey, being indicated on the Diagram No. 1 by the words "River-bank in 1814;" and the tract, the field-notes of whose survey are above given, being marked on that diagram as "No. 579, N. Jarrot."

To the north of this tract of one hundred acres to Jarrot were two other tracts, each of one hundred acres. They are numbered on the Diàgram No. 1, the one 624 and the other 766, and their general position is thus shown. Jarrot, in virtue of a transfer from some other French settler, claimed also this latter tract, No. 766.

At a later date, that is to say in 1815, a certain Pierre Coudaire got a survey which covered the whole of the three

abovementioned tracts, and some irregular edges on the east between them and the Cahokia Creek, as also a small strip bending round and going to the south of the southernmost of the three tracts, or tract No. 579. What this survey embraced on the west—that is to say, on the river side—not embraced by the surveys of the others, or, more especially, and so far as that extent of line was concerned, not embraced by the west line of tract No. 579—and whether it embraced anything at all—in other words, whether it brought the title any more upon or to the river than the old surveys—was one of the questions of the case. The field-notes of Coudaire's survey, which a drawing, Diagram No. 3, thus illustrates, called for a post in the northwesterly line of survey

DIAGRAM No. 3.

MISSISSIPPI RIVER

636 as the point of beginning; thence south 38° 50′ west with said line 17 poles to a post; thence south 51° 10′ east with another line of said survey 134 poles, to a post on the west side of Cahokia Creek; "*thence down the said creek with its different courses;*" thence by courses and distances described to a post. The field-notes then continued:

"Thence 85° W. 174 poles to a post *on the bank of the Mississippi River*, from which*—thence N. 5° E., up the Mississippi River and binding therewith (passing the southwesterly corner of Nicholas Jarrot's survey No. 579, claim No. 99, at 6 poles),

---

* There was a considerable blank here, in which no doubt the bearing of some object was meant to be inserted; though it never was in fact inserted. —REP.

551 poles and 10 links to a post, northwesterly corner of Nicholas Jarrot's survey, No. 766, claim No. 100, from which a sycamore 36 inches diameter bears S. 21° W. 29 links; thence S. 85° E. with the upper line of the last-mentioned survey 88 poles to the beginning."

The right of Jarrot was confirmed at an earlier date than that of Coudaire. Coudaire's survey bore the number 786.

Several old maps were introduced which seemed to show plainly enough that at the time when the surveys were made the river-bank, in this part of it, ran in what might fairly be called a straight line. Oral testimony in the record proved also that it did so.

We have already said that after the surveys were made the east bank of the river greatly advanced. But what caused this change in position was not quite obvious.

About the time when the new land began perceptibly to form, certain coal-dykes for the accommodation of the public were built above the point where the land in controversy was. The United States also made some improvements to throw the channel of the river more towards the city of St. Louis, that is to say, away from the side where these tracts were, and the city itself put certain large rocks on one edge of the river to preserve its own harbor. How far, exclusively of natural causes, all this had formed the new land was not clear. The evidence showed, however, that the defendants had nothing to do with the making of any of these artificial works, and it was not clear that in a river like the Mississippi the new land might not have been made without them, and by natural causes alone.

The fact that the additions were a making was perceptible at certain intervals, though the additions were too gradual to strike the eye as they were in the actual process of formation.

In this state of things, and a considerable addition having now been made, Congress, on the 15th of July, 1870, passed an act in these words :*

---

* Chapter 301, 16 Stat. at Large, 364.

" That the title of the United States to all lots, out-lots, tracts, pieces, parcels, and strips of land in St. Clair County, State of Illinois, lying and situate outside of the United States surveys as noted in the field-notes of the United States surveyors, and on the Mississippi River near surveys 766, 624, and 579, . . . &c., be, and the same is hereby, confirmed and granted to said St. Clair County, in said State."

The plaintiff, St. Clair County, claimed under the above-quoted acts, and under certain other acts of legislation, Federal and State, not necessary to be quoted.*    Its positions were:

1st. That the west boundary of the earlier and the later survey was the same; that this west boundary was a line originally. established irrespective of the river line; that accordingly the lands included by the surveys never extended to the river, and that the new-made land, even if it were " accretion," or " alluvion," never belonged to the owner of tracts surveyed, as riparian owner, but was unconveyed land belonging to the United States, which by its above-quoted act of Congress, it had granted to the plaintiff, St. Clair County.

2d. That if what is above said as to the western line of the tracts as surveyed was not true, and if the tracts did originally extend to the river, yet that the made land was not " accretion " or " alluvion " in a legal sense, since the making had been brought about by artificial means; that therefore the new land belonged to the United States as sovereign.

3d. That even if neither of these two propositions were true, yet that the surveys were specifically brought *to* the river and were limited to one hundred acres each, and hence that they could not embrace an addition as large as or larger than themselves.

4th. That, independently of all other positions, the Mis-

---

* Act of February 18th, 1871, chapter 58, 16 Stat. at Large, 416; act of September 28th, 1850, chapter 84, 9 Id. 519; also under the acts of the legislature of Illinois of the 22d of June, 1852; of the 12th of February, 1853; of March 4th, 1854; of February 18th, 1859; and of March 11th, 1869.

sissippi in the sense of the American law—where "navigability" meant navigability in fact—was a "navigable river," as respected riparian rights, and that accretions on it belonged to the sovereign.

The position of the defendant, Lovingston, who held under the two surveys, 579 and 786 (a valid title to which was admitted to be in him, or in those under whom he claimed), was, that those surveys were both (or certainly the last one) bounded originally by the river, and that whether the additions were caused wholly by natural causes or whether in part by the artificial structures, as causes causative, the new land fell within the technical and legal idea of accretion or alluvion, and so belonged to him as riparian owner; and that it made no difference, even if by the terms of the survey or grant the title came originally but *to* the river, or whether the river was a "navigable" one or not.

Of this opinion was the Supreme Court of Illinois, where the case finally came, and where judgment was given for the defendant.    The case was now here on error from that judgment.

*Mr. Gustavus Koerner, for the plaintiff in error :*

The *history* of these hundred acre tracts, often called militia tracts, should be stated by the reporter as part of the case. They are facts, which go to constitute the *case*, and are an important part of it.

So far back as June 20th, 1788, in a resolve of the old Congress of the United States,[*] a report was made to Congress, and approved by it, for confirming the rights of old French settlers in Illinois.

The Congress under the present constitution in 1791[†]— re-enacting the resolve of June 20th, 1788—provided in the sixth section that the governor of the Territory should be authorized to make a grant of land, "*not exceeding one hundred acres*, to each person who hath not obtained any donation,"

---

[*] 1 Bioren & Duane's Statutes, 203, chap. 101.

[†] 1 Stat. at Large, 221.

&c., and who has done militia duty, " the said land to be laid out in such form and place as the said governor shall direct."

Section eight provided that the governor should lay out the said lands agreeably to the act of Congress of June 20th, 1788, an act which provided that they shall be located within certain parallelograms.   These parallelograms of one hundred acres each were, of course, defined plats of ground. They made what the Roman law calls *agri limitati.**

Independently of which, it is plain that a grant is not carried to the centre of the stream, but stops at the bank, if the grantor describe the land as beginning *on* the *bank* of a river; or as coming only *to* a post or point *on* the shore; and carries a boundary, not by the stream, but by a straight line between points on its bank.   This confines and limits everything to the lines described.

Now, alluvion is an accretion of a tract of land, bounded by a river, *the owner of which is not limited by a certain measure.* It does not apply to the *ager limitatus.*   Moreover alluvion must be not only gradual and imperceptible, but be also by *natural causes.†*   The causes here were not natural causes, but artificial ones.

The common law as to rivers not navigable has adopted the civil law.‡

We have heretofore referred to the history of those claims; now let us make the application.

The region of country from the mouth of Wood River, a little below Alton, to the mouth of Kaskaskia River, between the bluffs on the east and the Mississippi River on the west, is generally known as the American Bottom.   It is about ninety miles long, and averages five miles in width.

At the time of the resolve of Congress, June 20th, 1788,

---

* Section 20, Inst., De rerum divisione et qualitate; Lex 7, Dig. ≀ 3; also Lex 12 ib.; Lex 16, De acquirendo rerum dominio, 41, 1; Lex 24, Dig. ≀ 3, De aqua et aquæ pluv., &c., 39, 3; Lex 1, ≀ 1, Dig., De fluminibus, 43, 12.

† Section 20, Inst., De rerum divisione, 2, 1; Lex 7, ≀ 1, Dig., De acquirendo rerum dominio, 41, 1.

‡ 3 Washburne on Real Property, *452; Angel on Watercourses, ≀ 53; 1 Bouvier's Law Dictionary, title " Alluvion;" 3 Kent, 428*.

no American resided there. The principal settlements were at the Kaskaskies, Prairie des Rochers, and Cahokia, the latter opposite Carondelet, and a little below St. Louis, though there were others, such as Fort Chartres, Prairie du Pont, and Cantine, the latter extending nearest to Wood River. Now, these donations, *one hundred acres*, were limited to exactly the quantity fixed by the law. It would have been most unjust to give one militia man one hundred acres, and to another, by possible accretion, one thousand acres.

It is to be presumed that the surveyors, under the direction of the governor of the Northwest Territory, carried out the directions of the law; that is, that they laid out said reservations in parallelograms. This being done, there was no possibility of making the river the boundary, except where, as in this case, as the maps show, accidentally the river-bank was quite straight and fell on the western line of the parallelogram, though it was not so straight but what one of the points of the survey was fixed in the river.

Now in the field-notes of survey 579, the tract in question, there is not a word said about meandering with the river, but all goes on points and *lines* clearly given. The field notes of the Coudaire tract are equally definite, and more significant; for while the eastern boundary, beginning on the Cahokia Creek, is made to run " *thence down the said creek with its different courses*," quite a different language is adopted as to the west boundary. It comes to *a point* on the bank of the Mississippi, but there is not a word said, as before, about going up the said river with " *its different courses*." The language is " up the Mississippi, and binding therewith."

The west line of the Coudaire survey seems in fact to be identical with the west line of the three militia claims.

Both these land donations, militia claims and Coudaire settlement rights, were each a well-defined, measured tract of land.

Coudaire, whose right was younger than that under the militia claims, took nothing of these militia claims nor anything but the fractions east, between the lines of the militia claims and the meanders of the Cahokia Creek; the lower

part on Diagram No. 3, and which is shaded.   The title of the defendants to the land in question ultimately rests solely on the militia claims; the Coudaire grant being utterly void as to them.

There was no advantage of the river front when these' locations were made.   The country was hardly settled.   St. Louis was a little village.   The important point was Carondelet, on the Missouri side, six miles below.   Canoes, and now and then a keel-boat, were the only craft on the river. No wharfage, no woodyards were thought of.

We have thus far argued the case strictly within the case in *Middleton* v. *Pritchard*,* and other decisions of the Supreme Court of Illinois, which are to the effect that all grants bounded upon a river *not navigable* (to which class they decide the Mississippi River to belong), as to riparian rights, entitle the grantee to claim to the centre thread of the river and all the islands lying between the main land and the centre thread of the current.

The doctrine that no rivers are navigable, except wherein ebb and tide flows, said to be the common-law doctrine, but denied even in England, is repudiated by many decisions in the State courts.†

In this court decisions have been made which strongly favor the view that the navigability of the river does depend on *navigation in fact*, and not on the supposed English definition.

If then the Mississippi is a navigable river, as to riparian rights, the accretions belong to the sovereign, and Congress had an undoubted right to grant them to the county of St. Clair.

*Mr. W. H. Underwood, contra :*

Every position taken by the opposing counsel is so well

---

* 3 Scammon, 510.

† Carson *v.* Blazer, 2 Binney, 475; Commonwealth *v.* Fisher, 1 Pennsylvania, 462; Wilson *v.* Forbes, 2 Devereux, 30 ; Oates *v.* Wadlington, 1 McCord, 580; Elder *v.* Burrus, 6 Humphreys, 358 ; Bullock *v.* Wilson, 2 Porter, 436 ; People *v.* Canal Appraisers, 33 New York, 461 ; McManus *v.* Carmichael, 3 Clark (Iowa), 1.

answered in the opinion of Thornton, J., delivering the unanimous judgment of the court below, and every position which we would desire to enforce is so well there presented, that we do little but offer to this court his ideas in his own language.

If the land of the riparian proprietor was bounded by the Mississippi River, his right to the possession and enjoyment of the alluvion is not affected, whether the stream be navigable or not. By the common law, alluvion is the addition made to land by the washing of the sea, a navigable river, or other stream, whenever the increase is so gradual that it cannot be perceived in any one moment of time. The navigability of the stream, as the term is used at common law, has no applicability whatever to this case. If commerce had been obstructed, or the public easement interrupted, or a question was to arise as to the ownership of the bed of the stream, then the inquiry as to whether the stream was navigable or not, in the sense of the common law, might be pertinent. No such question is presented. On this branch of the case the only question is: Have the United States, or has the State, or the riparian owner, the right to the accretion?

If the river is the boundary, the alluvion, as fast as it forms, becomes the property of the owner of the adjacent land to which it is attached. On a great public highway like the Mississippi, supporting an immense commerce and bearing it to every part of the globe, purchasers must have obtained lands for the beneficial use of the river as well as for the land. Can it be presumed that the United States would make grants of lands bordering upon this river, with its turbulent current, and subject to constant change in its banks by alluvion upon the one side and avulsions upon the other, and then claim all accretion formed by the gradual deposition of sand and soil, and deprive the grantee of his river front? If he should lose his entire grant by the washing of the river he must bear the loss, and he should be permitted to enjoy any gain which the ever-varying channel may bring to him. If a great government were to under-

take under such circumstances to dispossess its grantee of his river front, the attempt would be akin to fraud, and it would lose the respect to which beneficent laws and the protection of the citizen would entitle it.

Sir William Blackstone says* as to lands gained from the sea by alluvion, where the gain is by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For "*de minimis non curat lex;* and besides, these owners, being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is, therefore, a reciprocal consideration for such possible charge or loss."

The same reasoning applies, with all its force, to the lands abutting upon the Mississippi River.

This question has been discussed with profound research and great ability by the courts in Louisiana, as to accretions upon this same river, and the law clearly announced. In *Municipality No. 2 v. Orleans Cotton Press,*† it was declared that the right to future alluvial formations was a right inherent in the property, an essential attribute of it, the result of natural law, in consequence of the local situation of the land; that cities, as well as individuals, had the right to acquire it, *jure alluvionis,* as riparian proprietor; and that the right was founded in justice, both on account of the risks to which the land was exposed and the burden of protecting the estate. The court further assimilated the right to the right of the owner of land to the fruits of a tree growing thereon.

The same principle was declared by this court in *Banks v. Ogden.*‡

The only portion of the field-notes to which we desire to call attention is the following:

" ' To a post on the westerly side of the Cahokia Creek, thence down the creek with the different courses thereof,' and ' thence

---

\* 2 Commentaries, 262.                                    † 18 Louisiana, 122.

‡ 2 Wallace, 57; see, also, The Mayor, &c., of New Orleans v. The United States, 10 Peters, 662; Jones v. Soulard, 24 Howard, 41; Warren v. Chambers, 25 Arkansas, 120.

N. 85° W. 174 poles, to a post on the bank of the Mississippi River; from which thence N. 5° E., up the Mississippi River and bounding therewith (passing the southwesterly corner of Nicholas Jarrot's survey No. 579, claim No. 99, at 6 poles), 551 poles and 10 links, to a post northwesterly corner of Nicholas Jarrot's survey No. —, claim No. 100.' "

This survey was made in 1815. From the copy of the plat of it, from the custodian of the United States surveys, it will be seen that the line along Cahokia Creek meanders with the stream, which was sinuous, and hence the call in the notes, " down the said creek, with the different courses thereof." A further examination of the plat will show that though the line from " a post on the bank of the Mississippi River to a post northwesterly corner of Nicholas Jarrot's survey, claim No. 100," is a straight line, the river-bank as indicated by the plat was also straight in 1815. The Coudaire survey embraces three militia claims which had been surveyed before, and which were confirmed to Jarrot.

One of the Jarrot surveys begins on the bank of the Mississippi, and thence to a point in the river, &c.

Concede that the Jarrot survey did not make the river the boundary by specific call, yet its beginning was *on the bank* of the river opposite St. Louis, and thence it followed the river to a point on it. It is, then, evident that at this time there was no land between the western line of the Jarrot survey and the river. All the plats introduced in evidence show that the river-bank was straight, and the point in the river must have been made for the purpose of obtaining the bearing of the witness tree, a sycamore 250 links from the point. It is manifest that the river was the boundary, and whether the grant was bounded by the river or on the river can make no difference as to the question involved. The grant may be so limited as not to carry it to the middle of the river, and yet not exclude the right to the alluvion.

The counsel for the county argue that a grant is not carried to the centre of a stream, but stops at the bank, if the grantor describes the line as upon the margin, or at the edge

or shore, and that these terms become monuments, and that they indicate an intention to stop at the edge or margin of the river.   This may be good law, and not affect the rights of the defendants.   They do not claim the bed of the stream, and the river does not run over the land in dispute at ordinary stages of water.   Their claim, if established, does not obstruct the river, or interfere with its free navigation and use by the public.

But the Coudaire survey not only covers the Jarrot surveys, but extends beyond them.   It not only takes any fractions between the Jarrot surveys and Cahokia Creek—the parts at the bottom of Diagram No. 3, and shaded—but the land, if any, between their western line and the river.   The Coudaire survey ran up the river, *binding it*, and passed the southwesterly corner of the Jarrot survey, No. 579, at six poles.   Language could not make it more plain, that the western line was bounded by the river; and the plats confirm this view.

The only construction to be given to these grants is, that the United States had conveyed the land to the bank of the Mississippi.   It follows that the grantees were riparian proprietors, and are the owners of the alluvial formations attached to their lands.

Unless such construction be given and adhered to rigidly, almost endless litigation must ensue from the frequent changes in the current of the Mississippi and the continual deposits upon one or the other of its banks; the value of land upon its borders would depreciate, and the prosperity of its beautiful towns and cities would be seriously impaired.

Opposing counsel say that at the time the locations were made there was no advantage of river-front, no wharfage, and no wood-yards.   This may be true, but even at this early period the grantees must have realized the vast importance of the Mississippi to them, and to all the people of the States bordering upon it, in the grand future soon to be unfolded.   They must have seen the necessity, and accepted the grants, for the purpose of securing an approach to the river.

Before 1819 a ferry was established across the river, near to the land in dispute, and has been since in constant operation.   Before 1850 a city had sprung up on the Missouri side of the river, and a prosperous village was growing on the Illinois shore.   Before 1852 a charter for a railroad had been granted by the State, which resulted in the construction of a road from Terre Haute, in the State of Indiana, to Illinoistown.   Prior to the grant made by the United States in 1870, a number of railroad tracks had been constructed upon the ground formed by accretion, and an elevator erected, and dykes for the use of wagons, and a large expenditure of money made by the ferry company for the preservation of the banks recently made.   These are matters of known public history.

It needed no prophetic eye to foresee, prior to the year 1850, these grand improvements which bring the products of an empire to the Father of Waters.   Their absolute necessity, and consequent construction, as an outlet for our immense produce had been known for more than a quarter of a century before their completion.   Their usefulness would be greatly crippled and the public thereby seriously suffer if ready access to the river was denied.

It would be a strained construction to hold that, in making these grants, the United States reserved all accretions, and thus to deprive these proprietors of ferry privileges and the beneficial enjoyment of the river.

It is further contended that the lands are not accretions, as they were made by artificial and not natural means.

Concede, what is not clear, that the dykes, to some extent, caused the accretions.   They were not constructed for such purpose; and the defendants had nothing to do with their erection.

The fact that the labor of other persons changed the current of the river, and caused the deposit of alluvion upon the land of the defendants, cannot deprive them of a right to the newly made soil.

If portions of soil were added to real estate already pos-

sessed by gradual deposition, through the operation of natural causes, or by slow and imperceptible accretion, the owner of the land to which the addition has been made has a perfect title to the addition.   Upon no principle of reason or justice should he be deprived of accretions forced upon him by the labor of another, without his consent or connivance, and thus cut off from the benefits of his original proprietorship.   If neither the State nor any other individual can divert the water from him, artificial structures, which cause deposits between the old and new bank, should not divest him of the use of the water.   Otherwise ferry and wharf privileges might be utterly destroyed, and towns and cities, built with sole reference to the use and enjoyment of the river, might be entirely separated from it.

In *Godfrey* v. *The City of Alton*,* the public landing had been enlarged and extended into the river, both by natural and artificial means, and this court held that the accretions attached to and formed a part of the landing.

In *New Orleans* v. *The United States*,† the quay had been enlarged by levees constructed by the city, to prevent the inundation of the water, and the court held that this did not impair the rights of the city to the quay.

In *Jones* v. *Soulard*,‡ the intervening channel between the island and the Missouri shore had been filled up in consequence of dykes constructed by the city, and the riparian owner succeeded.

In the case at bar the accretions have not been sudden, but gradual, as we gather from the testimony.   The city of St. Louis, to preserve its harbor and to prevent the channel from leaving the Missouri shore, threw rocks into the river, and the coal-dykes were made to afford access to boats engaged in carrying across the river.   The ferry company protected such accretions by an expenditure of labor and money.

The accretions are partly the result of natural causes and partly of structures and work erected and performed for the

* 12 Illinois, 29.        † 10 Peters, 662.        ‡ 24 Howard, 41.

good of the public. The defendants should not thereby lose their frontage on the river, and be debarred of valuable rights heretofore enjoyed. This would be a grievous wrong, for which there would be no adequate redress.

Mr. Justice SWAYNE delivered the opinion of the court.

We shall assume, for the purposes of this opinion, that all the title which could be passed by Congress and the State was and is vested in the plaintiff in error.

It is not denied, on the other hand, that a valid title to the surveys 579 and 786 is vested in those under whom the defendant in error holds.

Two questions are thus presented for our determination:

One is, whether the river-line was the original west boundary of the surveys, or either of them?

The other, if this inquiry be answered in the affirmative, is, to whom the accretion belongs?

The first is a mixed question of law and fact. The second is a question of law.

Before entering upon the examination of the first of these questions, it may be well to advert to a few of the leading authorities apposite to this phase of the case.

It is a universal rule that course and distance yield to natural and ascertained objects.* A call for a natural object, as a river, a spring, or even a marked line, will control both course and distance.†

Artificial and natural objects called for, have the same effect.‡

In a case of doubtful construction, the claim of the party in actual possession ought to be maintained, especially where it has been upheld by the decision of the State tribunals.§

In *Bruce* v. *Taylor*,‖ a patent called "to begin on the Ohio

---

* Preston's Heirs *v.* Bowmar, 6 Wheaton, 580.

† Newsom *v.* Pryor's Lessee, 7 Id. 7.

‡ Barclay and others *v.* Howell's Lessee, 6 Peters, 499; Baxter *v.* Evett's Lessee, 7 Monroe, 333.

§ Preston's Heirs *v.* Bowmar, *supra.*

‖ 2 J. J. Marshall, 160.

River, and then for certain courses and distances, without any corners or marked lines, to the mouth of the Kennikek, and then certain courses and distances, without any courses or marked lines, to a stake in the Ohio River." If the river was the boundary, the land in controversy was within the patent. If the courses and distances prevailed, the patent did not affect it. The court said: "It is our opinion that the river is the boundary." It was added: "Two of the calls are on the river. There are no intermediate marked lines or corners. The general description is, 'to lie on the Ohio.' These facts alone would not leave room for any other construction of the patent." This case is very instructive, and contains much additional argument in support of the view expressed. *Cockrell* v. *McQuinn*,* is to the same effect. In the latter case the court said: "None will pretend that the legal construction of a patent is not a matter proper for the decision of the court whose province it is to decide all questions of law." In *Bruce* v. *Morgan*,† the rule laid down in *Bruce* v. *Taylor* was affirmed.

Where a survey and patent show a river to be one of the boundaries of the tract, it is a legal deduction that there is no vacant land left for appropriation between the river and the river boundary of such tract.‡

Where a deed calls for a corner standing on the bank of a creek, " thence down said creek with the meanders thereof," the boundary is low-water mark.§

Where a deed calls for an object on the bank of a stream, " thence south, thence east, thence north to the bank of the stream, and with the course of the bank to the place of beginning," the stream at low-water mark is the boundary.||

Where the line around the land was described as " running to a stake at the river, thence on the river N. 6° 40′ 23 perches, thence N. 39° 50′ W. 33 perches, thence N. 20° 20′,

---

* 4 Monroe, 62.    † 1 B. Monroe, 26.    ‡ Churchill v. Grundy, 5 Dana, 100.
§ McCullock's Lessee v. Aten, 2 Ohio, 309; see, also, Handly's Lessee v. Anthony, 5 Wheaton, 380.
|| Lamb v. Rickets, 11 Ohio, 311.

35 perches and 8 links to a stake by the river," it was held that this description made the river a boundary.*

Where premises above tide-water are described as bounded by a monument standing on the bank of the river, and a course is given as running from it down the river as it winds and turns to another monument, the grantee takes *usque filium aquæ*, unless the river be expressly excluded from the grant by the terms of the deed.†

The eastern line of the city of St. Louis, as it was incorporated in 1807, is as follows: "From the Sugar Loaf east to the Mississippi, from thence by the Mississippi to the place first mentioned." This court held that the call made the city a riparian proprietor upon the river.‡ It was said in this connection that "many authorities resting on adjudged cases have been adduced to us in the printed argument, presented by the counsel for the defendant in error, to show that, from the days of Sir Matthew Hale to the present time, all grants of land bounded on fresh-water rivers, where the expressions designating the water-line are general, confer proprietorship on the grantee to the middle of the stream, and entitle him to the accretions. We think this, as a general rule, too well settled, as part of the English and American law of real property, to be open to discussion."

It may be considered a canon in American jurisprudence, that where the calls in a conveyance of land, are for two corners at, in, or on a stream or its bank, and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise. Whether in the present case the limit of the land was low-water, or the middle thread of the river, is a question which does not

---

* Rix v. Johnson, 5 New Hampshire, 520.

† Luce v. Carley, 24 Wendell, 451.

‡ Jones v. Soulard, 24 Howard, 44; see, also, Schurmeier v. St. Paul and Pacific Railroad, 10 Minnesota, 830, and Shelton et al. v. Maupin, 16 Missouri, 124.

arise, and to which we have given no consideration.  The point was considered by this court in *Railroad* v. *Schurmier.**

Survey 579 is the elder one.  Its calls are: " Beginning on the *bank of the Mississippi River*, opposite to St. Louis, from which the lower window of the United States storehouse in St. Louis bears N. 70¾ W.; thence S. 5 west 160 poles to a *point in the river* from which a sycamore 20 inches in diameter bears S. 85 E. 250 links, thence S. 85 E. 130 poles (at 30 poles a slash) to a point; thence N. 15 W. 170 poles to a forked elm on the bank of Cahokia Creek; thence N. 85 W. 70 poles to the beginning."

It will be observed that the beginning corner is on the bank of the river.  The second corner is a point in the river. The line between them is a straight one.  Where the course as described would have fixed the line does not appear.

There was an obvious benefit in having the entire front of the land extend to the water's edge.  There was no previous survey or ownership by another to prevent this from being done.  No sensible reason can be imagined for having the two corners on the river, and the intermediate line deflect from it.  Under the circumstances we cannot doubt that the river was intended to be made, and was made, the west line of the survey. In the light of the facts such is our construction of the calls of the survey, and we give them that effect.

The calls of survey No. 786, as respects this subject, are: " Thence N. 85° W. 174 poles, to a post *on the bank of the Mississippi River, from which* . . . ; *thence N. 5° E. up the Mississippi River and binding therewith* (passing the southwesterly corner of Nicholas Jarrot's survey, No. 579, claim No. 99, at 6 poles), 551 poles and 10 links, to a post northwesterly corner of Nicholas Jarrot's survey, No. —, claim No. 100, from which a sycamore 36 inches diameter bears S. 21° W. 29 links; thence S. 85° E. with the upper line of the last-mentioned survey 88 poles to the beginning."

Here the calls as to the river are more explicit than in

* 7 Wallace, 287.

survey No. 579.   The language "up the Mississippi River and binding thereon," leaves no room for doubt.   Discussion is unnecessary.   It could not make the result clearer. The river must be held to have been the west boundary of this survey also.

In reaching these views we pervert no principle of law or justice.   Our conclusions are sustained by authority and reason.

This brings us to the consideration of the second question.

It is insisted by the learned counsel for the plaintiff in error that the accretion was caused wholly by obstructions placed in the river above, and that hence the rules upon the subject of alluvion do not apply.   If the fact be so, the consequence does not follow.   There is no warrant for the proposition.   The proximate cause was the deposits made by the water.   The law looks no further.   Whether the flow of the water was natural or affected by artificial means is immaterial.*

The law in cases of alluvion is well settled.

In the Institutes of Justinian it is said: "Moreover, the alluvial soil added by a river to your land becomes yours by the law of nations.   Alluvion is an imperceptible increase, and that is added by alluvion which is added so gradually that no one can perceive how much is added at any one moment of time."†

The surveys here in question were not within the category of the *agri limitati* of the civil law.   The latter were lands belonging to the state by right of conquest and granted or sold in plats.   The increase by alluvion in such cases did not belong to the owner of the adjoining plat.‡

The Code Napoleon declares:

"Accumulations and increase of mud formed successively and imperceptibly on the soil bordering on a river or other

---

* Halsey *v.* McCormick, 18 New York, 147; 3 Washburne on Real Property, 58, 353*.

† Lib. II, Tit. I, ₰ 20.

‡ D. XLI, 1, 16; Sanders's Institutes, 177; see, also, Morgan *v.* Livingston, 6 Martin's Louisiana, 251.

stream is denominated 'alluvion.' Alluvion is for the bene-
fit of the proprietor of the shore, whether in respect of a
river, a navigable stream, or one admitting floats or not; on
the condition, in the first place, of leaving a landing-place
or towing path conformably to regulations."*

Such was the law of France before the Code Napoleon
was adopted.†

And such was the law of Spain.‡

Blackstone thus lays down the rule of the common law:

"And as to lands gained from the sea, either by alluvion,
by the washing up of land and earth, so as in time to make
terra firma, or by dereliction, as when the sea shrinks below
the usual water-marks; in these cases the law is held to be
that if the gain be by little and little, by small and imper-
ceptible degrees, it shall go to the owner of the land adjoin-
ing. For *de minimis non curat lex;* and besides, these owners
being often losers by the breaking in of the sea, or at charges
to keep it out, this possible gain is, therefore, a reciprocal
consideration for such possible charge or loss. But if the
alluvion be sudden or considerable, in this case it belongs to
the king; for, as the king is lord of the sea, and so owner
of the soil while it is covered with water, it is but reasonable
he should have the soil when the water has left it dry."§

Blackstone takes his definition from Bracton, lib. 2, chap.
2. Bracton was a judge in the reign of Henry III, and the
greatest authority of his time. Hale, in his *De Jure Maris,*
says Bracton followed the civil law. Hale himself shows
the great antiquity of the rule in the English law.‖

Chancellor Kent, the American commentator, recognizes
the rule as it is laid down by the English authorities re-
ferred to.¶

---

* Book II, of Property, &c., § 556.

† 4 Nouveau Dictionnaire de Brillon, 278; Morgan *v.* Livingston et al.,
6 Martin, 243.

‡ Partid. iii, tit. xxviii, Law 26.

§ 2 Commentaries, 262; see, also, Woolwich's Law of Waters, 34; and
Shultes's Aquatic Rights, 116.

‖ De Jure Maris, 1st pt., ch. 6; see, also, The King *v.* Lord Yarborough,
1 Dow & Clark, Appeal Cases, 287.            ¶ 3 Commentaries, 428.

By the American Revolution the people of each State, in their sovereign character, acquired the absolute right to all their navigable waters and the soil under them.* The shores of navigable waters and the soil under them were not granted by the Constitution to the United States, but were reserved to the States respectively. And new States have the same rights of sovereignty and jurisdiction over this subject as the original ones.†

The question here under consideration is not a new one in this court. In *New Orleans* v. *The United States*,‡ it was said : " The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory, and as he is without remedy for his loss in this way he cannot be held accountable for his gain."

To the same effect are *Saulet* v. *Shepherd*,§ and *Schools* v. *Risley*.‖

In the light of the authorities alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction, and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. Whether it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property.

---

* Martin *v.* Waddell, 16 Peters, 367; Russel *v.* The Jersey Co., 15 Howard, 426.

† Pollard's Lessee *v.* Hagan et al., 3 Howard, 212; Pollard *v.* Kibbe, 9 Id. 471; Hallett *v.* Bute, 13 Id. 25; Withers *v.* Buckley, 20 Id. 84.

‡ 10 Peters, 662.          § 4 Wallace, 502.          ‖ 10 Id. 110.

The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The maxim *"qui sentit onus debet sentire commodum"* lies at its foundation. The owner takes the chances of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if a gradual gain, it is his. The principle applies alike to streams that do, and to those that do not overflow their banks, and where dykes and other defences are, and where they are not, necessary to keep the water within its proper limits.*

In England the rule which is applied to gradual accretions on the shores of fresh waters is applied also to such accretions on the shores of the sea.†

We may well hold that the adjudications of this court to which we have referred are decisive of the case before us. They are binding upon us as authority. We are of the opinion that the United States never had any title to the premises in controversy, and that nothing passed by the several acts of Congress and of the legislature of Illinois, relied upon by the plaintiff in error.

JUDGMENTS AFFIRMED.

---

* 3 Washburne on Real Property, 58, *452; Municipality No 2 *v.* Orleans Cotton Press, 18 Louisiana Rep. 122.

† The King *v.* Lord Yarborough, 3 Dow & Clark's Appeal Cases, 178.