## STATE OF KANSAS v. MERIWETHER et al.

(Circuit Court of Appeals, Eighth Circuit. October 11, 1910.)

### No. 2,980.

1. NAVIGABLE WATERS (§ 45*)—BEDS AND BANKS OF STREAM—AVULSION.

A destruction of the surface of land lying on the shore of a river by a flood or other sudden and destructive process does not destroy the title of the owner, and even, though it becomes the bed of the river for a time and presumptively the property of the state, its subsequent restoration, whenever it occurs, inures to him who originally owned it.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 279; Dec. Dig. § 45.*]

2. NAVIGABLE WATERS (§ 44*)—RIPARIAN OWNERS—ACCRETIONS.

In order to vest title in a riparian owner on a river by accretion, the constitutive sedimentary deposits along the shore must be gradual, imperceptible, and natural.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 268; Dec. Dig. § 44.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. NAVIGABLE WATERS (§ 44*)—RIPARIAN OWNERS—ACCRETION.

Where a sand bar formed along the shore of a river which gradually extended into the channel, the fact that it was higher at the side next the channel than next the shore is not inconsistent with the claim that the land so formed was an accretion to the shore land.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 267; Dec. Dig. § 44.*]

4. NAVIGABLE WATERS (§ 44*)—RIPARIAN OWNERS—ACCRETION.

Where land was gradually formed along the shore of a river by deposits of sand and soil, the title of the owner of the adjoining shore land to such new-formed land as an accretion is not defeated by the fact that after it had risen above the water he drove piles to hold it in position and accelerate further deposits thereon.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 267; Dec. Dig. § 44.*]

5. NAVIGABLE WATERS (§ 44*)—"ALLUVION."

"Alluvion" is an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous, and may be the effect of either natural or artificial causes.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 267; Dec. Dig. § 44.*

For other definitions, see Words and Phrases, vol. 1, pp. 349, 350.]

Appeal from the Circuit Court of the United States for the District of Kansas.

Interpleader between the State of Kansas and Hunter M. Meriwether and others. Decree in favor of Meriwether, and the State appeals. Affirmed.

The question presented by this record is whether Meriwether or the state of Kansas is entitled to the sum of $22,000 resulting from a condemnation for the use of a railroad company of a tract of land situated in Wyandotte county, Kan. The case has been here before and is reported in 96 C. C. A. 281, 171 Fed. 39, to which reference can be made for some facts deemed unnecessary to be stated here. The Chicago Great Western Railway Company, successor to the rights of the City Terminal Railway Company, for whose benefit the condemnation was had, filed a bill of interpleader to secure an adjudication of the claims of several persons to the money. While others originally asserted some right to it, the controversy now concerns the claims of Meriwether and the state of Kansas only, and is to be determined by ascertaining which of the two owned the land at the time it was condemned. They each, in obedience to the order of the court requiring them to interplead, filed intervening cross-bills setting forth their respective claims to the money, which was deposited in the registry of the court.

Meriwether in his cross-bill alleged that the land, which was situated on the south bank of the Missouri river immediately below the influx of the Kansas river and west of the state line between Kansas and Missouri, constituted a part of a larger tract, patented by the United States in 1857 to Silas Armstrong, which part he, by mesne conveyances, had duly acquired; that subsequently the Missouri river washed away a large tract of land lying on its south bank including that in question: that its channel was diverted southwardly and for many years ran over the lower and remaining strata of this land. He then employed the following language: "That in the year 1888 the said river began anew to change its course, and new land or accretions were gradually deposited against and added to the remaining portion of said land on the south side of said river, such accretions and additions continuing from time to time until all of the tract hereinafter described (being the land involved in this suit) had thereby been created, * * * and that your orator and those under whom he claims have reclaimed and made per-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

manent again their lands which they originally owned as the successors and grantees of said Silas Armstrong and those holding under him. * * *" He then proceeded at length to show the steps taken by him and his grantors to reclaim and permanently hold the new land, and alleged that all these steps were taken openly and notoriously, with the knowledge, approval, and consent of the state of Kansas. Other averments are found in his cross-bill which will be referred to later.

The state of Kansas in its cross-bill, after making allegations similar to those of Meriwether concerning the title and washing away of the land and the change of the river's channel, alleged that afterwards "there appeared above the surface of said stream, and within the channel of said stream, an island, which was on both sides of the state line at said point, and on the Missouri side of the main channel of said stream of which island the state of Kansas was the owner by reason of its being formed upon and within the bed and channel of said stream, which island gradually extended toward the Kansas or right bank of said stream, also that another or other islands appeared in the bed of said stream on the Kansas side of the state line, and on the Missouri side of the main channel or deeper part of stream, which other island or islands also belonged to the state of Kansas for the same reasons, and that said islands by gradual accretion thereto became united and extended until they reached the Kansas bank. * * * And defendant says that the said land so condemned was not an accretion to the main land or to any land owned by said Meriwether or to any person through or under whom he claims, but that the same consisted of islands which formed and appeared in the channel of the Missouri river and accretions thereto, all of which belonged to this defendant, by reason of which fact this defendant is entitled to have and receive the said sum of $22,000."

To this intervening cross-bill Meriwether filed an answer, in which he denied the insular theory of the state and reasserted his claim that the land condemned was formed by accretions to his riparian possessions.

On these pleadings the cause was referred to a special master to find the facts and report the same with his conclusions of law for the information of the court. He found, among other things, that at the time the patent was issued to Armstrong in 1857 the south bank of the Missouri river was considerably north of the land condemned; that soon thereafter the river washed away its southern bank; that in 1869 it had reached and washed away the land in question, which then belonged to Meriwether or his grantors, with considerable more land lying south of it; that its progress was then stayed by riprapping the bank; that by this invasion of the land the channel of the river was diverted southwardly so that it ran immediately along and north of the riprapped bank where it continued to run for a period of about 20 years until 1887 when, employing the language of the master, "a change in the bed of said river caused by a shallowing of the channel opposite the riprapped bank began to occur, and a sand bar accretion to said bank began to form after the spring rises in said river, and also a sand bar began to form on the northern and eastern side of the channel as it then existed and from thence on said band bar accretion and sand bar extended north and east and substantially parallel with the south bank and increased in height and width, and, with their extension and growth, the channel of the river grew shallower and receded in a northerly and easterly direction."

He found that in the year 1889 the National Waterworks Company, an owner of land fronting on the river above that in question, constructed a dyke located about 1,600 feet up stream from the land in question; also, that the city of Kansas City at about that time extended a sewer out into the new current of the river; that the effect of these constructions was to retard the flow of water around the point of land at the influx of the Kansas river, make it flow further northward, accelerate the accretion along the southern bank of the river, and increase the height, width, and length of the sand bar in the receding channel of the river; that as a result the channel receded further north and east until in the year 1891 or 1892 it ran, and has ever since continued to run, several hundred feet north of the land in question.

He made a finding in the following words: "Prior to the building of the dyke by the National Waterworks Company hereinbefore mentioned and the shallowing of the channel of said river along and opposite to the riprapped bank as hereinbefore stated, there was an island which had formed in said river east of the state line between the states of Kansas and Missouri. After the building of said dyke and during the recession of the channel of said river from the riprapped bank to the north and east, accumulations of sand formed upon and along the western side of said island and extended across the state line upon the land in controversy. This sand formation was visible during the low stages of water and appeared as an extension of said island at such times but was submerged at high water."

He also found that the ground immediately north and along where the riprapped bank had been located was at a lower level than the sand bar formation further to the north, and that the land in question was partly in the bed of the channel of the river as it was before it receded to the north, but principally on the slope of the sand bar formation on the west and south of the island in Missouri east of the state line.

After finding these facts and some others which are involved in them or are immaterial to a disposition of the case, the master advised the court that Meriwether was the owner of the land which had been condemned, and that the state of Kansas had no right or title to it, or to the money derived from its condemnation.

The Circuit Court afterwards heard the case on the pleadings, report of the master, exceptions thereto filed by the state, and the evidence produced; confirmed the findings and conclusions of the master; and entered a decree in favor of Meriwether. To reverse this decree the state prosecutes an appeal.

Fred S. Jackson, Atty. Gen., and L. W. Keplinger (A. L. Berger, on the brief), for appellant.

Robert E. Ball (Hunter M. Meriwether, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge (after stating the facts as above). Some argument is made by counsel for Meriwether that the land was washed away by a great storm or flood which lashed the shore, tore away the land, and made a sudden and immediate change in the channel of the river. It is contended that this constituted an avulsion which, notwithstanding the fact that the lower remaining land became the bed of the river and remained so for 20 years, did not vest title in the state, but left it, and its upper surface when restored, the property of the original owner. Assuming the facts to be as just stated, the proposition of law contended for cannot be doubted. A destruction of land lying on the shore of a river, by such a sudden and destructive process, does not destroy the title of the owner, and, even though it becomes the bed of the river for a time and presumptively the property of the state, its subsequent restoration whenever it occurs inures to him who originally owned it. However strongly we may be persuaded from tradition and judicial decision (Fowler v. Wood, 73 Kan. 511, 85 Pac. 763) that the surface of the land in question was destroyed by an avulsion and that Meriwether's title was never in fact disturbed, we are prevented from disposing of the case on that ground. No such claim was made by Meriwether in his cross-bill, and that fact must conclude our further consideration of it now.

The next proposition advanced by counsel for the state is that as Meriwether admitted in his cross-bill that the site of the land was

for many years the bed of a navigable stream, and as the state of Kansas was the owner of that bed (Illinois Central R. R. v. Illinois, 146 U. S. 387, 456, 13 Sup. Ct. 110, 36 L. Ed. 1018; Fowler v. Wood, supra; and Peuker v. Canter, 62 Kan. 363, 63 Pac. 617), and as there was no pleading of an avulsion, the title to the land belongs to the state because it is not averred or proved that it became Meriwether's by accretion.

Is it so averred?

The law is well settled that in order to vest title in the riparian owner by accretion the constitutive sedimentary deposits along the shore of the river must be gradual, imperceptible, and natural. County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59; Warren v. Chambers, 25 Ark. 120, 91 Am. Dec. 538, 4 Am. Rep. 23; Peuker v. Carter, supra. Applying this conceded test, we do not discover the claimed infirmity in Meriwether's pleading of title by accretion. His cross-bill, which has been set forth in considerable detail, tenders a clear, definite, and certain issue that the land was formed by accretion to his riparian holdings. This was denied by the state, and, in its cross-bill, it alleged that the land arose from the bed of the river as an island. This in turn was denied by Meriwether. We fail to see how any plainer issue of fact could be joined.

Is it so proved?

After sufficient perusal of the evidence to assure us that there was substantial support for the conclusions reached by the master and the trial court, and that no obvious or serious error has intervened, we shall, in answering this question, follow the established rule and take the findings of fact, so far as made, to be true.

The master found and reported that, cotemporaneously with the shallowing and recession of the channel of the river in 1887, "a sand bar accretion to said bank began to form, * * * and also a sand bar began to form on the northern and eastern side of the channel as it then existed, and from thence on said sand bar accretion and sand bar extended north and east and substantially parallel with the south bank and increased in height and width, and with their extension and growth the channel of the river grew shallower and receded in a northerly and easterly direction." Also, that the accretion to the shore was accompanied by a like accretive action on the west and south side of an island situated across the state line in Missouri, and that the land was left at a lower level along the riprapped bank than further north, near to the newly made channel where the sand bar was discovered.

Because of this last-mentioned fact, among others, it is contended by learned counsel for the state that the land condemned was not an accretion to the shore, but was an isolated growth, an island rising from the bed of the river. We, however, are unable to agree to this. Not only did the special master and the trial court find against it, but, by reason of the claim that their findings are uncertain and inconclusive, we have examined the evidence including several authentic topographical surveys and plats made between the years 1886 and 1892 while the land was forming, and from them all we are satisfied that

the accretion theory is sustained by the proof and that the insular theory is not sustained. The fact that the land along the new channel is a little higher in elevation than that which lies further inland, nearer to the riprapped bank, is a condition not inconsistent with the conclusion reached. The evidence tends to show that in the process of land formation by accretion it is not uncommon to find higher levels next to the channel and a recession to lower levels further inland. Certainly the slight difference of elevation in the surface of the new formation relied on by counsel is not sufficient to establish their contention. The fact that the accretion resulting in the land in controversy was partly to the Missouri island as well as to the shore, as indicated in the findings of the master, makes no difference in the rights of the parties. It appears that Meriwether is the owner of the island also.

It is next contended that the cross-bill of Meriwether discloses that the land was formed, not by the gradual, imperceptible, and natural deposit of sand and dirt brought down by the waters of the river, but by artificial means resorted to by Meriwether and those under whom he claims. We have already considered the facts disclosed by the findings of the master and the proof and have reached the conclusion that it was not in fact formed by any artificial devices. Nevertheless it is contended that Meriwether pleaded himself out of court by admitting that it was. After a careful analysis of the pleading, we find this contention untenable. In stating the issues joined, we quoted from Meriwether's cross-bill, among other things, the following:

"In the year 1888 the said river began anew to change its course, and new land or accretions were gradually deposited against and added to the remaining portion of said land on the south side of said river, such accretions and additions continuing from time to time until all of the tract hereinafter described (being that now in controversy) had thereby been created."

Independent of what follows, the allegations just quoted undoubtedly tendered the issue that the land condemned consisted of accretion to the upland. The state undoubtedly so understood it. It denied that the land was an accretion and explained its denial by advancing its own theory, namely, that it was an island which had risen from the bed of the river.

Meriwether after tendering this issue proceeded with other allegations showing that the land had been reclaimed by driving piles across the newly made accretion to hold it in position and accelerate the further deposit and did other like things for the same purpose. From allegations of this kind the contention is that Meriwether pleaded himself out of court by admitting that the land was formed by artificial means adopted by him to produce the formation. The intent and meaning of the pleading as a whole, however, is to the effect that, after the natural accretive action had progressed so far that land had appeared in the place where the water stood, certain work was done to solidify and make it available for practical use. The legal significance of these allegations appears from the further averment that all this work was done with the knowledge and consent of the state. In view of these facts, Meriwether predicated a further claim to the land by estoppel so far as the state was concerned.

It is always permissible in pleading to present as many different legal theories as the facts of the case permit, provided they be not inconsistent. These clearly were not so. The first was that the land belonged to Meriwether because it was formed by gradual and natural process of accretion to his shore land. The next was that after the land was so formed Meriwether performed certain expensive work upon it with a view of making it permanent and thus reclaiming what had been lost, and that this was so done with the knowledge and consent of the state, by reason whereof the latter is estopped in equity from asserting any title as against him. The contention, therefore, that Meriwether admitted in his pleadings that the accretion was produced by artificial means cannot be sustained. It is, however, unnecessary to rest our judgment upon any debatable view of the pleadings, and lest the implication be indulged that, except for the pleading of the two defenses, the acts of Meriwether would have defeated his title by accretion, we proceed a step further.

Counsel for the state make no contention that the alluvial deposit along the southern shore, in so far as it was caused or accelerated by the projection either of the dyke of the waterworks company or the sewer of the city, was produced by any such artificial means as affected Meriwether's title. He or those under whom he claims were not responsible for and had no control over those works, and most obviously their rights cannot be affected by them. County of St. Clair v. Lovingston, 23 Wall. 46, 50, 66, 23 L. Ed. 59. Their sole contention is that those facts pleaded as an estoppel by Meriwether disclose the employment of such artificial means in securing the sedimentary deposit against his upland as destroys his title by accretion.

We have carefully examined the authorities cited by them on this proposition, and in our opinion they fail to support it. They announce the proposition that a riparian owner along a navigable stream cannot fill out his bank with dirt or débris taken from the shore and thus encroach upon the bed of the stream belonging to the public and thereby secure title by accretion. See Board of Park Commissioners v. Taylor, 133 Iowa, 453, 108 N. W. 927; Saunders v. N. Y. C. & H. R. R. R. Co., 144 N. Y. 75, 83, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729; People ex rel. Blakslee v. Commissioners, 135 N. Y. 447, 32 N. E. 139; and In re Driveway in City of New York, 46 Misc. Rep. 157, 93 N. Y. Supp. 1107. But these and other like cases in our opinion have no application to the facts disclosed in Meriwether's second claim to the money. In the aspect most favorable to the state, he did nothing but accelerate in a perfectly lawful way the deposit of sediment which was being washed down in physical solution with the waters of the river. This, according to the law of nations as shown by Mr. Justice Swayne, who wrote the opinion in the Lovingston Case, supra, belongs of right to the owner of the upland against which it may be deposited. It is in the nature of compensation for the loss he is constantly sustaining by the erosion of his banks. New Orleans v. United States, 10 Pet. 662, 9 L. Ed. 573. He most obviously can stay the erosive action by any lawful means, and why may he not in like manner aid the restoration of what had been taken from him? Provided the proximate cause of the restoration be the deposits of sand and dirt

brought down by the current of the river, we think any lawful means for accelerating such deposits or confining them when once in place present no bar to acquisition of title by accretion.

Mr. Justice Swayne in the Lovingston Case states the rule thus:

"It is insisted by the learned counsel for the plaintiff in error that the accretion was caused wholly by obstructions placed in the river above, and that hence the rules upon the subject of alluvion do not apply. If the fact be so, the consequence does not follow. There is no warrant for the proposition. The proximate cause was the deposits made by the water. The law looks no further. Whether the flow of the water was natural or affected by artificial means is immaterial. * * * In the light of the authorities, 'alluvion' may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. * * * Whether it is the effect of natural or artificial causes makes no difference."

See, to the same effect, Tatum v. City of St. Louis, 125 Mo. 647, 28 S. W. 1002; Whyte v. City of St. Louis, 153 Mo. 80, 54 S. W. 478; Gould on Waters (3d Ed.) § 155; Steers v. City of Brooklyn, 101 N. Y. 51, 4 N. E. 7; Black v. Diver, 68 Kan. 204, 74 Pac. 1123; Halsey v. McCormick, 18 N. Y. 147.

Many other questions were ably argued by counsel; but, as the case is disposed of on grounds already considered, we refrain from protracting this opinion further.

The conclusion reached by the learned trial judge was right, and the decree is affirmed.