ADELA VACHIER, Plaintiff and Appellant, *v.* McCORMICK, ALCAIDE & CO., Defendant and Appellee.

No. 318. Decided December 7, 1962.

*Carlos D. Vázquez* for appellant. *Blanco Lugo & Souss* and *Félix Ochoteco, Jr.,* for appellee.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The Río Grande de Loíza is a common boundary between the lands of the parties in this litigation. The plaintiff is the owner of a property south of the river. The defendant of one to the north. With the flow of time and of the waters of the river, the erosive action of the current has changed the course of the river at the expense of plaintiff's lands. This process has been developing gradually since the year 1914 and at the time that this complaint was filed, August 8, 1958, defendant's property had increased its area by 7.40 cuerdas. To revendicate this portion of land plaintiff filed the present suit.

The trial court dismissed the action relying on the provision of § 302 of the Civil Code, 31 L.P.R.A. § 1169. This provision provides that "The augmentation which the banks of a river gradually receive from the effects of the current of waters belongs to the owners of the tenements adjacent to such banks." The plaintiff maintains that the application of that provision is erroneous. She maintains that the second part of § 309 of the same Code, 31 L.P.R.A. § 1176 is the applicable provision. Said section provides in full: "When the current of a river divides itself into branches, leaving a tenement or a part thereof isolated, the owner of such tenement retains his ownership. *He also retains it, if a piece of land becomes separated by the current.*" (Plaintiff's italics to indicate the part that should be applied.)

The Civil Code dedicates § § 302 to 309, both inclusive, to regulate the relations between the persons who possess lands bordering bodies of water. In each case it establishes to whom the lands affected by the changes of the body of water belongs. The phenomenon of accession of soil may take place in four different ways, to wit: (a) by

alluvion; [1] (b) by avulsion; [2] (c) by change of channel or course of a river; [3] (d) by formation of islands. [4] Ways (a), (b) and (d) are regulated by provisions taken from the

---

[1] It is regulated by § 302 which was applied by the trial judge in disposing of the present case and which we have set out in the text of the opinion. Section 303—31 L.P.R.A. § 1170—establishes the rights of the person who possesses lands adjacent to ponds or lakes and provides thus:

"The owners of tenements adjacent to ponds or lakes do not acquire the land left dry by the natural decrease of the waters nor lose that inundated thereby in unusual floods."

[2] It is regulated by §§ 304—31 L.P.R.A. § 1171—and 305—31 L.P.R.A. § 1172—which provide:

"Sec. 304. When the current of a river, rivulet or torrent cuts off from a tenement on its bank a known portion of land and transfers it to another tenement, the owner of the tenement to which the portion cut off belongs retains the ownership of such portion.

"Sec. 305. Trees uprooted and carried away by the current of waters belong to the owner of the land upon which they are carried, if the former owners do not claim them within a month. If such owners claim them, they shall pay the expenses caused by the collecting and securing of the same in a safe place."

Referring to this mode PEDREGAL, in his Comentarios al Código Civil Español 585, footnote 1 (Madrid 1889), criticizes this section inasmuch as "... it happens so very seldom and even in the event, which is very problematic, that it should happen, it shall be so unusual that the prejudiced landowner better take care in going to gather and remove his land to the point of origin or to another... lest such action be labelled as true calculations."

[3] The change of channel is regulated by §§ 306—31 L.P.R.A. § 1173— and 307—31 L.P.R.A. § 1174—which read thus:

"Sec. 306. If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.

"The said owners shall have the right to their former property if the river or stream returns to its former channel.

"Sec. 307. When a new bed is opened through a private tenement by navigable river, which changes its course through natural causes, the said bed shall become part of the public domain. The owner of the tenement shall recover the same, in the event of the waters leaving it again dry, whether by natural means or through labor lawfully authorized for this purpose."

[4] The rights appertaining to the islands thus formed are regulated by §§ 308—31 L.P.R.A. § 1175—and 309—31 L.P.R.A. § 1176—(copied in

Spanish Civil Code, while the (c) modality was adopted from the Civil Code of Louisiana, § 306, and from Spain, § 307.

We shall consider in the first place the provision applied in deciding this case and then turn to the provision which appellant alleges should be applied.

■ Section 302 of our Civil Code—equivalent to § 366 of the Spanish Code—sanctions an ancient and traditional mode of acquisition. Without expressly using the word, the aforesaid section incorporates into the Code what the Romans called "alluvio" and which in our language is known as alluvion. Alluvion is defined as "the increase of land which is successively and imperceptibly formed on the banks or shores of the river." II *Enciclopedia Española de Derecho y Administración* 580, *Aluvión* (Madrid 1849). And in that same text on p. 581 it continues saying: "The alluvion, considered as a means of acquiring property, is a right of citizens and it belongs with that class of rights which, as we said in the article entitled Acquisition, are deemed to be primary or primitive. Emperor Justinian himself, accepting the doctrine of Gaius, the jurist, expressly confirmed this when he said: 'Praeterea quod per alluvionem agro tuo flumen adjecit jure gentium tibi adquiritur.' However, this did not cause it to be known in the ancient legislation of that nation nor did it become established until the glorious era of Emperor Justinian, when an answer of Cassius, the jurist, which was later adopted as a rule, to a consultation made by the riparian landowners of the Po as to increases on some fields to the prejudice of others, gave rise to the legislation approved in this connection."

the text of the opinion).

"Sec. 308. Islands which, through successive accumulations of descending alluviums, are slowly formed in rivers, belong to the owners of the banks or shores nearest to each of them, or to those of both shores if the island is in the middle of the river, and they shall then be divided longitudinally in halves. If a single island thus formed be more distant from one bank than from the other, then the owner of the nearest bank shall be the sole owner thereof."

In the Roman law the rule was expressed thus:

"Alluvion means a latent increment... What is added by alluvion to the land becomes of the same nature thereof... It is considered as added by alluvion what is added so gradually that you cannot tell how much is added at any moment of time ... What is added to our land by alluvion belongs to us..." 2 OYUELOS, *Digesto* 105 (Madrid 1917).

The Wise King incorporated the rule adopting the cardinal idea set forth in the Roman Law. Thus, Title 28, of Partida III, states:

"Rivers sometimes swell to such a height, that they carry away a portion of one estate, and join it to another, situated elsewhere, on their banks. Wherefore we say, that the earth which a river carries away from an estate, little by little, and imperceptibly, because not all in a body, becomes the property of him to whose estate it is carried, and he who lost it, has no claim whatever to it."

The same principle appears in the Napoleonic Code. Section 556 of said Code provides:

"The accumulations and increase of mud formed successively and imperceptibly [5] on the soil bordering on a river or other stream, is denominated 'alluvion.'"

"Alluvion is for the benefit of the proprietor of the shore, whether in respect of a river, a navigable stream, or one admitting floats, or not; on condition, in the first case, of leaving a landing-place or towing-path conformably to regulations."

This mode of acquisition has been universally accepted. "This ruling of the Roman law has universal endorsement of all the legislations. All, without exception, confirm it..." 2 FALCÓN, *Código Civil Español* 52 (Madrid 1889). In

---

[5] The Spanish lawmaker instead of using the concept "successively and imperceptibly" to describe the alluvial increases used the concept "gradually." The Partidas used "little by little." The concept "little by little" or "gradually" is more precise. And actually it has been interpreted that "imperceptibly" insofar as alluvial formations are concerned, is equivalent to "gradually." *Brighton & Howe General Gas Co.* v. *Howe Bungalows*, 1 Ch. 372, 13 B.R.C. 183 (1924).

America it appears, among others, in the Codes of Argentina, art. 2572; Bolivia, art. 301 (it contains very explicit language in providing: "The increases formed successively and imperceptibly on the shores of the river by the action of the waters are called alluvion. Alluvion benefits the riparian proprietor without the owner of the opposite side being able to claim the land he may have lost"); Brazil, art. 538; Colombia, art. 719; Cuba, art. 366; Chile, art. 650; El Salvador, art. 631; Louisiana, art. 509; Mexico, art. 908; Quebec, art. 420; Uruguay, art. 752.

In England, Bracton defined it thus:

"Alluvion is a latent increase, and that is said to be added by alluvion, whatever is so added by degrees, that it cannot be perceived at what moment of time it is added; for although you fix your eyesight upon it for a whole day, the infirmity of sight cannot appreciate such subtle increments, as may be seen in the case of a gourd, and such like."

■ Hence, it was accepted as a fundamental principle of the common law. *R.* v. *Lord Yarborough*, 5 Bing. 163 (1828), 1 Eng. Rul. Cas. 458. The provision bequeathed to us by the Rome of classic times that the alluvion belongs to the owner of the land to which it attaches is accepted in India. In the case of *Clarke* v. *Edmonton*, 4 D.L.R. 1010 (Can. 1929), the Supreme Court of Canada quotes from the case of *Sri Balsu Ramalaskmamma* v. *Collector of Godaveri District*, L.R. 26 Ind. App. 107 (1899), as follows: "There does not appear to be in Madras, as in Bengal, an express law embodying the principle that gradual accretion enures to the land which attracts it; but the rule, though unwritten, is equally well established." That was the law in prerevolutionary Russia. 1 PEDREGAL, *Código Civil Español Comentado* 584 (Madrid 1889). It prevails in the jurisdictions of the federal states of the American Union. *Ford* v. *Turner*, 142 So. 2d 335 (Fla. 1962); *Heikkinnen* v. *Hansen*, 360 P.2d 147 (Wash. 1961); *Wyatt* v. *Wycough*, 341 S.W.2d 18 (Ark.

1961) ; *Freiland* v. *Pennsylvania R. Co.*, 47 Atl. 745 (Penn. 1901) ; *Willet* v. *Miller*, 55 P.2d 90 (Okla. 1936) ; *Hubbard* v. *Manwell*, 14 Atl. 693 (Vt. 1888) ; *State of Kansas* v. *Meriwether et al.*, 182 Fed. 457 (8th Cir. 1910) ; *Abott* v. *City of Fort Madison*, 108 N.W.2d 263 (Iowa 1961) ; *Helsey* v. *McCormick et al.*, 18 N.Y. 147 (1858). UNDERHILL, *Determination of Rights Along the Missouri River*, 42 Iowa L. Rev. 58 (1956) ; Annotation, *The Law of Accretion to Shore Lands*, 58 L.R.A. 193 (1901).

As to justification for this rule which for so many years has governed the relations of riparian proprietors, which rule we have seen has been generally and universally adopted since ancient times, BONEL Y SÁNCHEZ in their work II-2 *Código Civil Español* 171 (Barcelona 1890), say:

"This article provides what was treated in Rome under the term alluvionem in par. 20, tit. 1, book 2 of the Institutes of Justinian and was later reproduced in Law 26, tit. 28, Partida III : Quod per alluvionem agro tuo flumen adjecit jure gentium tibi adquiritur, pursuant to the paragraph cited, giving an idea or defining what was meant by alluvion thus : Est autem alluvio incrementum latens quod ita paulatim adjicitur, etc. The term incrementum latens alone would be sufficient to indicate the extent of the alluvion and the juridical sense that said accession embodied, so that said phrase is reproduced in our local laws without it having any similarity to any of the other provisions of our ancient codes and such definition embodies the idea that by the right of the citizens a tenement acquires the increases which it imperceptibly receives even if at the expense of its adjacent owners. Hence the aforesaid Partida, translating this definition, states that everything the river carries away from an estate, little by little, and imperceptibly, because not all in a body, becomes the property of him to whose estate it is carried, and he who lost it has no claim whatever to it; and it is to the benefit of all the proprietors to accept mutually those insensible changes, which some commentators regard as inescapable effects of a tacit aleatory agreement with Nature."

LAURENT, in VI *Principios de Derecho Civil Francés* 423 (Mexico 1895), states:

"Portalis will give us reason for these provisions. In ancient law there was a struggle between the riparian landowners, the State, and the gentlemen of high justice. According to several customs the riparian took advantage of the alluvion, and others attributed it to the king when the river was navigable and to the gentlemen of high justice when it was not navigable. The riparians were sacrificed by a majority of the textwriters. Portalis says that the alluvion should belong to the riparian proprietor by virtue of the natural maxim that the benefit belongs to whoever runs the risk. Some riparian properties run a greater risk than others. There exists, so to speak, an aleatory contract between the riparian proprietor and nature, whose march may at every instant reduce or increase said tenement. In that sense it is said that rivers give and take as does fortune..."

On this point MANRESA states in III *Comentarios al Código Civil* 323 (7th ed., Madrid 1952):

"But there is still another reason which has been opportunely advanced by F. Ricci, the Italian textwriter. It grows out of the agricultural industry's own interest, which requires that accretion by alluvion should belong to the riparian proprietor. Who, indeed, can better cultivate and benefit from the alluvial land than the proprietor himself to whose land it is attached? To assign to someone else a strip of land formed by alluvion, apart from the fact that, as a general rule, it could not be cultivated as a separate unit, it would be necessary to impose on the riparian proprietor the new burden of a servitude, in order to facilitate the enjoyment of the former, which, besides being unjust, would give rise to suits and controversies."

In the case of *Morgan* v. *Livingston*, 6 Martin's Reports (O. S.) 19 (1819), the Supreme Court of Louisiana stated at p. 242:

"Alluvion is a mode of acquiring property by natural law, jure gentium, by those principles or maxims which regulated the conduct of men, before the formation of civil society.

"The Roman jurists, as Grotius informs us, proved this to be a natural right, from the maxim it is just that the advantages of any thing should belong to him who supports its disadvantages.

"This opinion of the Roman jurists seems to prevail in France. 'Equity,' says Brillon, 'requires that he who suffers the incomodity, should reap the advantages. As nothing is more prejudicial than the vicinity of a river, which inundates, submerges, and deteriorates the neighboring fields, nothing is more just than that the proprietor, to whom the stream has often borne prejudice, should conserve, in exclusion to all others, when it becomes beneficent, a gift, less a gain than a reparation, less a present than an exchange.'

"The right of increase by alluvion is grounded on the maxim of law which bestowes the profit and advantages of a thing upon him who is exposed to suffer its damages and losses."

See also: *Succession of Delachaise* v. *Maginnis*, 11 So. 715 (La. 1892) and *Miami Corporation* v. *State*, 173 So. 315 (La. 1936).

The Supreme Court of the Republic of Colombia expressed itself thus, in a decision copied in the annotation to § 719 of its Civil Code contained in JORGE ORTEGA TORRES, *Código Civil Anotado* (Bogotá 1957):

"The reasons that have given rise to the doctrine of accession by alluvion explain the need for the aforesaid requirements and help to indicate and determine the exact field of application of said institution.

"These reasons are: a) in the first place the lawmaker meant to establish in favor of the riparian proprietors a compensation for the risk they run by reason of the fact that their land borders on the water; b) in the second place the law meant to prevent that riparian proprietors, whose condition as such proprietors is to their benefit, should be deprived from that benefit by virtue of a natural fact."

The Supreme Court of the Republic of Colombia gives another reason. It is of incalculable benefit for a property owner to border on a river which may serve as a water trough for his cattle as well as for other agricultural purposes. If the law did not grant him the right to acquire the alluvion, this would set up a barrier between his tenement and the river, thereby depriving him of the benefits derived

from a bordering on the river. See also: *Lamprey* v. *Mitcalf*, 53 N.W. 1139 (Minn. 1893); *Cortés* v. *City of Manila*, 10 Phil. Rep. 567, 570 (1908); VI SCAEVOLA, *Código Civil* 602–605 (5th ed., Madrid 1949); II VALVERDE, *Tratado de Derecho Civil Español* 97 (4th ed. Valladolid 1936); 2 OYUELOS, *op. cit.*, at p. 106.

It having been established that the acquisition by alluvion is generally accepted, we must now explain how it operates. In the *Enciclopedia Española de Derecho y Administración*, *supra*, it is said:

■ "We have said that alluvion consists in the imperceptible and successive increase of land on the property adjacent to the banks of a river, which takes place with the lapse of time. This definition is the strictest and most common acception of the word alluvion; but it is likewise used by the commentators of the law to designate the increment attached to the land on one side of the river when the latter upon changing or abandoning its course, little by little, so that it cannot be perceived, leaves behind a dry part of its channel...

"The French Code, the English and almost all modern legislation which have adopted the Roman doctrine on this point, have not only acknowledged and taken the word *alluvion* in the first concept, that is, in the sense of a slow and imperceptible increase of the riparian tenements, but also in the second, that is, when the river recedes along one of its shores and leaves the other side dry. The French Code, with which almost all modern writers are in agreement concerning this matter, provides in its sec. 557 that relictions occasioned by a running stream retiring insensibly from one of its banks, and encroaching on the other, belong to the proprietor of the bank discovered by right of alluvion."

Thus it was interpreted in Spain in our time. To that effect GAYOSO ARIAS, in an article appearing in XII *Revista de Derecho Privado* 617 (1925), entitled *Casos de Accesión Natural*, states:

"... the increase must be attached gradually to the tenement bordering on the bank, and it must be attached by the action of

the current. However, this action may consist either of sedimentation or recession, as we have seen, and hence, both must be slow, insensible, in order that it may come under the scope of said provision."

See to the same effect the commentary of Portalis, State Counsel, in the Statement of Policy of the Code Napoleon, *El Código de Napoleón, Curso de Legislación* (Barcelona 1839).

The provision under consideration requires that the increase benefiting a riparian be gradual. No authority expresses with more preciseness what this term means in relation to alluvion, than does the Federal Supreme Court in the case of *County of St. Clair* v. *Lovingston*, 90 U.S. 46 (1874), after considering the Roman law, the Code Napoleon, the common law as it prevails in England and the states of the American Union, and the Spanish law as set forth in Partida III, Title 28, Law 26, *supra*, to conclude that it is a principle of universal acceptance. The court states thus:

██ "In the light of the authorities alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction, and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. ...The riparian right to future alluvion ... is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The maxim *'qui sentit onus debet sentire commodum'* lies at its foundation. The owner takes the changes of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if a gradual gain, it is his ..."

To the same effect, see *Clarke* v. *Edmonton, supra*. The *Lovingston* case was cited as a precedent in *Kansas* v. *Mis-*

*souri*, 322 U.S. 213 (1944), when the court stated: "The States are not in dispute about the applicable law. They agree that when changes take place by the slow and gradual process of accretion the boundary moves with the shifting in the main channel's course. Likewise, they agree that a sudden or avulsive change in that course does not move the boundary, but leaves it where the channel formerly had run."

In *Kansas* v. *Missouri, supra,* the former claimed from the latter two thousands acres of land. It alleged that they belonged to its jurisdiction and that they had become a part of the State of Missouri because of an abrupt change of channel of the Missouri river. The parties, as we stated above, accepted that the law is analogous to the applicable law governing individuals. The court, after considering the entire evidence, decided in favor of Missouri because the change in the river's channel was gradual and imperceptible.

As to the requirement that the increase be gradual and imperceptible, LAURENT states at p. 423 of the aforesaid text that "in vain it is said that because the increase is insensible it is for that same reason imperceptible. The alluvion is insensible in the sense that it is not noticed when it is formed; but it is very perceptible, because otherwise its possession would not be disputed." And at p. 439: "It is conceived that since the alluvial deposits are formed insensibly, they should belong by right of accession to the riparian proprietors; but although they are successive and imperceptible, these increases are at times very considerable." "There are alluvions which turn out to be larger than the principal tenement," page 444. "The lands of new formation are formed at the expense of the other riparians; would it not be fair that these riparians be compensated for this slow expropriation caused by the action of waters? The law does not grant them any compensation because it is impossible to determine who are the riparians that have gained what the others have lost. When a river flows from one shore to

another, it is well known who is the benefited proprietor, but no one knows what direction is followed by the particles of earth carried away by the waters from the riparian proprietor; and in the case of alluvion, properly speaking, it is not known either from which fields the insensible increases which enrich ones at the expense of others are derived. Hence it is impossible to apply the maxim of equity which prohibits the enrichment of one at the expense of another."

■ Now, what are the requirements that should be present in order that a landowner may claim the increases to the area of his property caused by the change of course of a river which is the common boundary with another property? SAN-TAMARÍA in his work *Comentarios al Código Civil* (Madrid 1958) sets them forth succinctly citing GAY DE MONTELLÁ:

"There are three precise general conditions for claiming an alluvion on a tenement bordering a stream, according to Gay de Montellá (I *Tratado de la Legislación de Aguas* 199 (1956)), to wit: (a) the tenement should have as its boundary the same river or stream channel; (b) that the deposit or land abandoned by the waters which constitutes the alluvion be attached to the bank or shore and form an integral part of the riparian tenement, and (c) that this deposit be formed slowly or imperceptibly, by the action of nature and not by the action of man." [6]

■ After examining the evidence presented to the trial judge, we shall immediately notice that in the present case all three conditions required for alluvion exist. The boundary of defendant's property is the Río Grande de Loíza; the portion of land in dispute forms an integral part of defendant's property. Using the words of the trial judge "the parcel claimed has merged with defendant's property." The controlling fact in cases of alluvion is that the increase to the property as a result of the change of the river's channel be

---

[6] It has been held that there is no "... obstacle, according to the doctrine, for a proprietor to be definitively favored by work done in defense of his property, such as plantations, fences, or surfacings ... provided he does not invade the bed." III-1 PUIG PEÑA, *Tratado de Derecho Civil Español* 123.

gradual, as it was established by the Roman law and sanctioned by our Civil Code, that it be formed little by little as determined by the Wise King, or imperceptibly as provided by other legislation and the common law. And that the increase in the case at bar has been so, is clearly revealed by the evidence presented by both parties. The river has changed its course gradually, imperceptibly, little by little. The increase has been formed little by little, gradually—it commenced in 1914—it has been by action of the river and in it the hand of man has taken no part. As stated by the trial court "In the change of the river's channel neither party has taken part."

The fact that the exact area which has come to form part of defendant's property may be determined because the courses and distances of the portion of land in controversy herein may be established is of no significance. What is important and controlling is that the process of increment be gradual, caused by the action of the course of the waters; that the deposits or land abandoned by the waters which constitute the alluvion be attached to the banks or shore and form an integral part of the riparian property.

. In the cases of accession by alluvion due to the change of the river's channel and its encroachment upon the lands of the property situated on the opposite side of the river, the increment on the gainful tenement has been at the expense of the opposite tenement. By reason of the erosive force of the current, the bed of the river is displaced leaving dry the former bed on which the flow of the river deposits particles of earth, sand, and stone which it carries from tenements located from up river. This portion of land thus formed is annexed to the adjacent land. If this process is slow, gradual, imperceptible to the eyes, when it is sought to be observed from day to day, it is a typical case of alluvion. In a majority of these cases it could be determined, by surveys carried out during the years in which the river has been

changing its channel, by plats drawn up and by the testimony of persons who know the community, what part of the perimeter of the increased tenement formed part of the tenement on the opposite side of the river. But the law universally accepted adjudicates to the riparian property the benefit of the increases that gradually and imperceptibly have enlarged the tenement at the time when such increases have not yet been identified because of the imperceptibility of its formation, and once adjudicated, the owner of the favored tenement should not lose, because of the fact that with the lapse of years they may become a considerable alluvial increment, what the law has periodically adjudicated to him.

In the case of *Clarke* v. *Edmonton, supra,* the Supreme Court of Canada held that alluvion was proper even if the increment was identifiable. To support its position it cited, among others, an Irish case. Citing from the opinion of Judge Gibson in the case of *A-G* v. *M'Carthy*, 2 Ir. R., 288-289 (1911), "each insensible addition attaches to the principal land, and though in result, the aggregate of additions may shew a substantial enlargement of the original territory, this cannot displace retrospectively the ownership of the previous minute accruing accretions. In other words, where the increase is imperceptible in its progress, that increase becomes the property of the owner to whose land it attaches as it is formed; it is vested in him *de diein diem* and no additional increase resulting from flood conditions can deprive the owner of the increase which had already vested in him."

In the case of *Brighton & Howe General Gas Co.* v. *Howe Bungalows,* 1 Ch. 372, 13 Br. Rul. Cas. 183 (1924), the question in issue was whether to grant accession by alluvion, if the increase could be identified. The general accepted rule was that the increment by alluvion profits the tenement to which it is attached, but it was alleged that it was so "where no other person can show a title to that soil." The court refuted this contention and stated that "So qualified, the

general rule, whether in relation to natural or to artificial accretion, becomes a mere platitude."

As we have previously stated, the increment by alluvion may be caused by sediments of the soil that the current carries or by the insensible recession of the water from one shore to the opposite. Commenting on the alluvial formation and considering the aspect of whether the proprietor of the adversely affected tenement could claim from the proprietor favored by the alluvion, RUGGIERO in I *Instituciones de Derecho Civil* 618 (Madrid), upon considering the provisions corresponding to the Italian Code maintains that:

"Patrimonial settlements between landowners of those shores that have been washed away or covered by the waters and those who are favored by the increment do not lie; the former cannot, not even when (as in the second of both figures) the loss suffered may be easily recognized, claim from the opposite shore the land it has lost."

The Supreme Court of Philippines in *Cañas* v. *Tuason*, 5 Phil. Rep. 688 (1906), had a similar question brought before it for consideration. The owner of a property bordering a river claimed as her own a parcel of land of 30 hectares (equivalent to 76.33 cuerdas) which by the action of the San Mateo River had become a part of the property situated on the opposite side of the river. The parcel in controversy was situated thirty years prior to the filing of the action as forming part of plaintiff's property. The decision rendered was against plaintiff under the authority of § 366 of the Philippine Civil Code, concomitant to the same section of the Spanish Code and to § 302 of our Code. Section 368 treating on the phenomenon of avulsion was invoked and upon refusing to apply it the court stated: "No witness declared that any of the pieces so separated had been carried to the other side of the river. This fact alone shows that the testimony of the witness is not sufficient to bring the case under article 368 [equivalent to our § 305]. Although a piece

of land of the size of a hectare may have been separated from Mariquina, yet if it were destroyed by the river and were not carried to Payatas, article 368 would not apply. We are inclined to think that what the witnesses observed was, as testified by one or two of them, that the bank was eaten away every year to a certain extent by the river; that is, that the river, to use the word employed by counsel for the appellants in their brief, destroyed the bank of the river. From the evidence in the case it is impossible to say that the current of this river has separated from the Mariquina estate a known parcel of land and has transported it to the Payatas side. The mere fact that thirty years ago the land now in question was on the Mariquina side of the river is not sufficient to prove that article 368 is applicable."

As stated by the Supreme Court of Philippines, it is unimportant whether the current carries away a considerable piece of land, if it is dissolved, as it generally happens, and is carried down river. To that effect the Supreme Court of the United States has expressed the following in the case of *Nebraska* v. *Iowa*, 143 U.S. 359 (1892) at p. 369:

"... two things must be borne in mind, familiar to all dwellers on the banks of the Missouri River, and disclosed by the testimony: that, while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water, and giving to the stream that color which, in the history of the country, has made it known as the 'muddy' Missouri; and, also, that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible reaction of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matter of increase of bank, always a

mere gradual and imperceptible process. There is no heaping up at an instant, and while the eye rests upon the stream, of acres or rods on the forming side of the river. No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed into the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other."

See also, LAURENT, *op. cit.*, p. 423.

In California where, as we have said, a similar provision to our § 302 exists, the question has been given the same treatment. *O'Connor* v. *Rumiano Brothers Company*, 321 P.2d 122 (Cal. 1958). The Federal Supreme Court had a similar question before it for consideration and it decided it in like manner recognizing the right of the owner of the riparian property which had been increased by alluvion. *Jefferis* v. *East Omaha Land Co.*, 134 U.S. 178 (1890). See also, Judgment of the Supreme Court of Spain of May 4, 1928, 183 *Jur. Civ.* 606.

We now turn to consider the provision that plaintiff-appellant maintains should have been applied. We said that it was the second part of § 309 of the Civil Code which provides: "When the current of a river divides itself into branches, leaving a tenement or a part thereof isolated, the owner of such tenement retains his ownership. *He also retains it, if a piece of land becomes separated by the current.*"

In support of her theory the plaintiff reads isolatedly the second part of the section as if it were a separate provision without any relation to the preceding statement. If we were to consider it that way we would find that on one hand § 302 grants to the owner of the tenement benefited by the alluvial increments the ownership thereof, while the separate provision invoked by plaintiff denies it.

 All the commentators who study the corresponding provision of the Spanish Civil Code, invoked by plaintiff— the second part of our § 309 equivalent to § 374 of the Spanish Code—do so under the concept of formation of islands. They all consider that that part of the invoked section governs a. specie of island formation; when a portion of land is abruptly separated from the property affected adversely by the current, the detached portion remaining isolated in the bed of the river. SCAEVOLA comments the second part of § 374 thus:

"Another modality that may be presented by the formation of islands, decides the second part of the section under analysis. The islands mentioned therein admit as a cause a detachment or separation of part of the land of the adjacent property, which portion arises in the middle of the river. It is, therefore, a case analogous to the avulsion or manifest force of the river. Indeed upon commenting sec. 368 we noticed that for such a situation to exist it was not necessary that the known portion of land be annexed to the property on the opposite side. Even if said portion is formed in the middle of the channel, as long as it meets the requirement of being known by its composition and aspect and by revealing the owner in whose possession it has been, it shall remain the property of the latter. *Well, this equitable rule is embodied in the second part of sec. 374.*" (Italics ours.) 6 SCAEVOLA, *Código Civil* 640-41 (5th ed. 1949).

And upon commenting § 373, equivalent to § 308 of our Code, SCAEVOLA states at p. 634:

"There are several kinds of islands: those that form a delta, governed by § 374 and those that remain floating on the surface of the water, whose land belongs to their original owners, as long as its instability does not cease; *this latter kind of islands is the one to which § 374 refers, when it provides that the owner of the property retains the ownership of the portion of the land separated therefrom by the current.*" (Italics ours.)

Section 374 is similarly construed by MANRESA, *op. cit.,* p. 359; III PUIG BRUTAU, *Fundamentos de Derecho Civil* 233

(Barcelona 1933) ; II BORRELL Y SOLER, *Derecho Civil Espa-
ñol* 231 (Barcelona 1955) ; 2 CASTÁN, *Derecho Civil Español
Común y Foral* 241 (9th ed., Madrid 1957) ; 2 VALVERDE,
*Tratado de Derecho Civil Español* 103–105 (4th ed., Valla-
dolid 1936) and III SÁNCHEZ ROMÁN, *Estudios de Derecho
Civil* 144–45 (Madrid 1900). See also, PADILLA, *Código
Civil Anotado* 622 (Manila 1953).

Hence, we reach the inescapable conclusion that the pro-
vision of § 309 invoked by appelllant is not applicable to the
facts of this case.

No words seem more appropriate for application to the
facts presented by this case than those expressed by Judge
Estey of the Supreme Court of Canada in his individual
opinion in the case of *Queens County* v. *Cooper*, 4 D.L.R.
705, 719 (1946). In this case the situation was the opposite
of the one in the case at bar. The owner of the tenement
increased by the alluvion brought an action to prevent the
defendant from interfering with the peaceful enjoyment of
the increment added to his tenement.

"The relative positions of the appellant and the respondent
have been determined by nature. The appellant here has been
fortunate, the respondent unfortunate. Sometimes nature
favours one and sometimes another, but such are changes in-
cidental to the soil abutting upon a body of water. The law rec-
ognizes such changes as inevitable and adjusts the rights of
the parties as and when and to the extent that nature alters
their positions. It is the natural process of accretion that has
altered the areas..."

For the reasons stated, the judgment appealed from is
affirmed.

Mr. Justice Blanco Lugo did not take part and Mr. Jus-
tice Rigau and Mr. Justice Ramírez Bages dissented.

---

MR. JUSTICE RIGAU with whom MR. JUSTICE RAMÍREZ BAGES
concurs, dissenting.

I regret to dissent from the majority opinion in this case. This is a case of accession but it is also a case of what IHERING, CASTÁN TOBEÑAS and others have called the realization of the law. That is, to take in each the law that is written on paper and make it a reality. The realization is the life of the law. As CASTÁN has written "the Law is to serve life, or, more exactly, pursues the realization of justice in life" and adds "this realization of the law may be conceived, and has been actually understood, in various times, in two different ways: as mere *application* of an abstract rule to concrete cases, or as the true and proper realization or elaboration of the Law."[a] Of the two modes mentioned by CASTÁN, I prefer the second and I believe that the Court in this case took the path of the first. I believe that it was induced to error by conceptualist jurisprudence of the Nineteenth Century, which jurisprudence pursued the form rather than the substance and which was wont to offer specious reasoning to support juridical thinking which actually needed an honest and rational reexamination.[b] But let us turn to the facts of the case and we shall return later to this matter which we now lay aside.

I

In the case at bar we had to decide whether natural, immovable and fluvial accession took place. After the trial the case was submitted to the Superior Court on documentary evidence consisting in plats and aerial photographs and on stipulations on which the parties agreed at a pretrial con-

---

[a] CASTÁN, *Teoría de la Aplicación e Investigación del Derecho* 1, Instituto Editorial Reus (Madrid 1947); III IHERING, *L'esprit du Droit Roman dans les Diverses Phases de son Development* 15 *et seq.*, trans. of Meulenaere, Paris, 1877, and cited in CASTÁN, *Ibid.*

[b] Some of those theories had their reason of being when they were born but once their ends were achieved, it became necessary to reexamine them, which has generally been done. For a critique of this jurisprudence of conceptions, see I POUND, Jurisprudence 91-117, West Publ. Co., St. Paul, Minn., 1959.

ference. In addition, the court made an inspection of the premises.

The facts proved and stipulated are simple: In 1935 the defendant acquired a property in the municipality of Carolina which was bounded on the south by the river "Río Grande de Loíza." In 1948 the plaintiff acquired the property located south of defendant's property, so that the river became the common boundary between both estates. The evidence reveals that in the course of several years the river changed its course towards the south entering plaintiff's property and dividing it in such a way as to leave on its northern side a parcel of 7.40 cuerdas of land separated from the main property and which parcel now is adjacent to defendant's property. The trial court expressed it thus:

"Since the year 1914 the river Río Grande de Loíza began to change its course gradually, particularly in that region where the parcel of land in dispute is located. Hence, prior to the gradual change of the direction of the river's channel, *the perimeter of land of 7.40 cuerdas described in the preceding paragraph formed part of plaintiff's property and was south of the river, but as a result of said gradual change of direction of the river's course, the perimeter of land of 7.40 cuerdas was gradually separated from the rest of plaintiff's property* and it is at present north of the river and adjacent to defendant's property on its southern side. As we have been able to notice, the river has receded little by little in this region and has been depositing washouts on the banks." Finding of Fact No. 5 of the Superior Court. (Italics ours.)

Defendant has taken possession of the aforesaid parcel. There is no dispute as to its area because its description, size, boundaries, courses and distances were proved and stipulated. The complaint contains a detailed and technical description of this parcel by distances in meters, courses by degrees, etc., which I deem unnecessary to reproduce here. We need only remember the fact.

Plaintiff filed an action of revendication to recover the possession of the aforesaid parcel, to which the defendant objected on the ground that it had acquired said land by right of accession and relied on § 302 of the Civil Code, 31 L.P.R.A. § 1169, the text of which we shall examine shortly. The trial court accepted the reasoning of the defendant, declared that §§ 302 of the Civil Code and 47 of the Law of Waters, 12 L.P.R.A. § 638, were applicable and dismissed the complaint. To review that judgment plaintiff appealed to the Supreme Court and maintains that § 309, and not § 302 of the Civil Code applies.

The right of accession is governed by a Chapter of the Civil Code which embraces §§ 287 to 318 (31 L.P.R.A. §§ 1131–1199) and as to the fluvial accession several sections of the Law of Waters contained in the Subchapter of that Law entitled "Accretions, Relictions, and Sediments of Waters," 12 L.P.R.A. §§ 631–642, are also applicable. The provisions of the Law of Waters on this matter are similar to those of the Civil Code.

The first section of the Civil Code which governs this matter, § 287, provides that "The ownership of property, whether movable or immovable, carries with it the right, by accession, to everything which is produced thereby, or which is united thereto or incorporated therewith, either naturally or artificially." 31 L.P.R.A. § 1131. Puig Peña explains that the word *accession* comes from the latin word *accessio*, which is in turn derived from *ad* (towards) and *cedo* (to approach), which presupposes the idea of *approach* of a thing, of *adherence*, of *incorporation*.[1]

Traditionally physical accession has been classified by the civilian writers into two categories, since it might result from a within to outside movement (accession by *production*) or from an outside to within movement (accession by *union*). Accession by union is also known as *continuous* accession.

---

[1] III Puig Peña, *Tratado de Derecho Civil Español* 115.

The latter is subdivided into *immovable* or *movable*, according to whether it is formed to benefit an immovable or a movable, and in *natural* and *industrial* or *artificial*, according to whether the increase is due to a natural force or the work of man.[2]

Our Civil Code recognizes, among others, the continuous, immovable, natural and fluvial accession in its four classical forms of alluvion, avulsion (to be defined shortly) or force of river, change of channel and formation of islands. With respect to accession it also provides for lands adjacent to ponds and lakes; also when the current of a river divides itself into branches; and when a portion of land is separated from the main property by the current. In the discussion that follows it will be noted that all these instances which we have mentioned (alluvion, avulsion, etc.) do not bear the same consequences with respect to the right of ownership. Some of those physical phenomena produce the juridical accession and others do not; or, in other words, some grant ownership and others do not. On this point the ancient civil law and our present Civil Code and the Law of Waters recognize the corresponding differences which are dictated by right reason and the sense of justice and equity.

We shall define each one of the cases we have mentioned but we shall consider lastly the cases of alluvion and of land separated from the main property by the current, because those are the two cases involved herein. The *avulsion* takes place when the current of a river, rivulet or torrent, separates from a tenement a known portion of land and moves it to another tenement. In this case the owner of the property to which the segregated portion belongs retains ownership thereof.[3] By avulsion the increase received by the riparian

---

[2] II CASTÁN, *Derecho Civil Español, Común y Foral* 233 (9th ed.).

[3] Section 304 of the Civil Code, 31 L.P.R.A. § 1171; § 44 of the Law of Waters, 12 L.P.R.A. § 635.

tenement is not due to the sedimentation of the waters.[4] In that case, MANRESA says, the law does not permit the effects of accession, because the owner of the segregated portion is known and because the two lands which shall thereafter be adjacent have not merged.[5]

The *change of channel* occurs, as the phrase itself indicates, when because of the natural change of the course of the waters, a river abandons its channel and takes a new one.[6] In this respect § 306 of our Civil Code provides that if a river should open itself a new bed, leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnity, the former bed of the river, every one in proportion to the quantity of land he has lost. 31 L.P.R.A. § 1173.

An the Law of Waters states in its § 41 that the channels of the rivers "which are abandoned through the natural deviation of the course of the waters belong, throughout their entire length, to the owners of the riparian lands. If the abandoned channel separated estates belonging to different owners, the new dividing line shall run at an equal distance from both." 12 L.P.R.A. § 632.

As to the *land adjacent to ponds and lakes* it is sufficient to state that pursuant to the Civil Code and the Law of Waters the owners of tenements adjacent to ponds or lakes do not acquire the land left dry by the natural decrease of the waters nor lose that inundated thereby in the floods.[7]

The type known as *formation of islands* includes several possibilities: (a) The formation or birth of islands in the seas adjacent to the coasts; (b) the formation of islands in navigable rivers; (c) islands formed in non-navigable rivers by successive accumulation of relictions; (d) islands formed

---

[4] CASTÁN, *Ibid.*, p. 238.

[5] III MANRESA, *Comentarios al Código Civil Español* 244 (6th ed.).

[6] Sections 306 and 307, Civil Code, 31 L.P.R.A. §§ 1173 and 1174; §§ 41 and 42, Law of Waters, 12 L.P.R.A. §§ 632 and 633.

[7] Section 303, Civil Code, 31 L.P.R.A. § 1170; § 40 Law of Waters, 12 L.P.R.A. § 631.

when the current of a river divides itself into branches.[8] Section 371 of the Spanish Civil Code provides that the islands formed in the seas adjacent to the coasts and in navigable rivers belong to the State. As to the islands formed in non-navigable rivers, § 373 of the Spanish Code grants the accession in terms similar to ours. The Puerto Rican Code, § 308, makes no distinction and refers in general to the islands formed "in rivers." It provides:

"Islands which, through successive accumulations of descending alluviums, are slowly formed in rivers, belong to the owners of the banks or shores nearest to each of them, or to those of both shores if the island is in the middle of the river, and they shall then be divided longitudinally in halves. If a single island thus formed be more distant from one bank than from the other, then the owner of the nearest bank shall be the sole owner thereof." Section 308; 31 L.P.R.A. § 1175.

The Law of Waters has a similar provision in its § 46; 12 L.P.R.A. § 637.

We now arrive at the two theoretical situations involved in this case: the alluvion and when a portion of land is separated from the main property by the current of the river. Therefore, we must examine these two cases in detail. *Alluvion* is established in § 302 of the Civil Code and § 47 of the Law of Waters. It is on this § 302 that the defendant relies. The trial court relied on both. The plaintiff relies on § 309 of the Civil Code. Let us examine the texts of those sections. Section 302 of the Civil Code (alluvion) provides:

"The augmentation which the banks of a river gradually receive from the effects of the current of waters belong to the owners of the tenements adjacent to such banks." 31 L.P.R.A. § 1169.

---

[8] CASTÁN, *Ibid.*, pp. 240-41; III PUIG BRUTAU, *Fundamentos de Derecho Civil* 233 (1953); PUIG PEÑA, *Ibid.*, pp. 126–28; MANRESA, *Ibid.*, pp. 254–56 and 259–64.

Section 47 of the Law of Waters reads as follows:

"The gradual increase of lands adjoining creeks, streams, rivers, and lakes caused by accretion or detritus shall belong to the riparian owners. Mineral sediments which are to be used as such must be applied for in accordance with the provisions of the mining laws." 12 L.P.R.A. § 638.

The Civil Code, § 309, provides for: (a) when the *current of a river divides itself into branches*, and (b) when a portion of land *is separated by the current* from the main property, as follows:

"When the current of a river divides itself into branches, leaving a tenement or a part thereof isolated, the owner of such tenement retains his ownership. *He also retains it, if a piece of land becomes separated by the current.*" (Italics ours.) 31 L.P.R.A. § 1176.

The situations pertaining to immovable fluvial accession regulated by positive law and the rules established therefor once examined, we now ask which is the criterion used by the Civil Code and the Law of Waters to grant or refuse the juridical accession, that is, the right of ownership, in each one of those situations? Except in the case of the islands formed in the sea and in the navigable rivers, which the Spanish Civil Code in good public policy declares to be public property, we may answer the preceding question by saying that the problem hinges on whether or not the natural forces have created a new property, the *res nova* (new thing) of which the civilian writers speak.[9] As a consequence of that criterion or parallel thereto, an important role is also played by the fact of whether the owner of the land in question is known.

Note that in the cases where the waters have not created new territory but a *detachment* has occurred, as in the case of avulsion (§ 304), or an *isolation* or *separation* of part of

---

[9] PUIG PEÑA, *Ibid.*, p. 116; CASTÁN, *Ibid.*, p. 235; PUIG BRUTAU, *Ibid.*, p. 215.

the property by the current of the waters (§ 309), no legal accession takes place; the former owner retains the ownership of the land detached, isolated or separated. On the contrary, juridical accession occurs in those cases where due to the gradual action of the waters (Civil Code) and their *sedimentation* (Law of Waters), *new property* has been created, without a *known owner*, as in the cases of alluvion (§ 302), and of formation of islands. In other words, the Code does not provide for the dispossession of an owner because of the fortuitous event that a torrent fractioned his property. What the Code does is to establish a series of convenient rules for such cases where the slow sedimentation of the waters has created a *new* surface, adhered and incorporated to a bank or in the middle of a river. Inversely, when the property affected by the action of the waters is old and has an owner (as in the cases of avulsion and separation of land) the owner retains his right of ownership over the land so affected.

The case at bar does not involve "sediments carried by the currents to the shores of the river bed." [10] This is not the case of new property, recently formed, of *res nova*, free to be taken by anyone. Nor is it land of unknown origin without a known owner, which must be added to the property of the adjacent owner. It is a parcel of 7.40 cuerdas which *already existed* in 1935 when respondent acquired the property; it is property that in 1948 was acquired by plaintiff as part of the property purchased by her at that time.

What has happened is that formerly the river passed on the northern side of that parcel, and as a result of having changed its course, today it passes on the southern side thereof. Straining defendant's argument, if the river had invaded further to the south and would now run along the southern boundary of plaintiff's property (as it previously ran along its northern boundary), would that mean that

---

[10] PUIG PEÑA, *op. cit.*, p. 121.

plaintiff would have been left entirely without property and that her whole property would have become the defendant's? The answer is clearly in the negative. Our law does not. recognize fluvial expropriation without compensation and for private purposes.

PUIG BRUTAU, in his comment on § 374 of the Spanish Code (equivalent to 309 of our Code), which deals with a situation like the one at bar, states: "Rather than a case of accession, it is a rule meant to reaffirm the right of the original owner who already was such owner of the portion separated." [11] The same view is shared by SCAEVOLA,[12] PEDREIRA CASTRO,[13] PUIG PEÑA,[14] CASTÁN,[15] and MANRESA.[16]

In the inspection made by the trial judge he observed that the land in question had gravel, sand and stone. It is natural that it be so. The river, upon passing for a certain period of time over that land, must have washed away the mould or humus leaving uncovered whatever stones were there; besides it is natural that at the same time it should have deposited sand and gravel. But the controlling fact is that this was done by the river *on land already existing there:* the river did not create those 7.40 cuerdas.

## II

My point is that the sections of the Civil Code regulating this matter do not do so arbitrarily: there is a reasoning behind it. That is, when the property affected by the water already exists and has a known owner, the owner retains his property; this is the fair solution. The Code does not authorize the dispossession by the fortuitous action of the wa-

---

[11] PUIG BRUTAU, *op. cit.*, p. 233 in fine.
[12] VI Civil Code 640–41 (5th ed.).
[13] 1 *El Código Civil a Través de la Jurisprudencia* 498.
[14] *Op. cit.*, p. 128.
[15] *Op. cit.*, p. 241.
[16] *Op. cit.*, p. 266.

ters. Examples of this are the sections previously discussed in this opinion: § 303 (case of ponds), § 304 (avulsion), § 305 (trees carried by the current), § 306 (river that abandons its channel), § 307 (new channel of the river), and § 309 (land isolated or separated by the river). On the contrary, when the waters, by sedimentation, create property which did not exist, the problem arises as to who is the owner of this new property. The Code provides certain rules to solve the problem. Such are the cases of § § 302 (alluvion) and 308 (formation of islands in rivers by accumulation of reliction).

In the case at bar, as above mentioned, we are dealing with a parcel of land which *existed* there, with *exact* description and dimensions, known to and stipulated by the parties and having a known owner before the defendant took possession thereof. Said parcel was isolated from the main property by the action of the river. To regulate such a situation there is a provision in the Civil Code; an express law based on rational and justice-oriented grounds. It should be noted that the majority opinion begins by declaring that the river has changed its course, which situation is governed by § 309 of the Civil Code. That clear and concrete reality of this case, which we have previously described, cannot be hidden behind a curtain of citations, some of which are theoretical discussions in abstract and others, decisions, some suitable to other facts while others are remains of certain jurisprudential tendencies of the old analytical school which (as POUND indicates in his above-mentioned work), was prone to try, not the case, but the theory. As the Supreme Court of the United States has had occasion to point out, the problems brought to the courts are not solved by a collection of citations, but according to the realities of the record. *Indianapolis* v. *Chase National Bank*, 314 U.S. 63, 69 (1941).

The majority opinion sets forth that the author SANTA-MARÍA enumerates the conditions that should exist in order

to establish alluvion and it states that they are (a) that the tenement be riparian, (b) that the alluvion be attached to the tenement and (c) that it be formed naturally and slowly. Based on this enumeration the Court finds that in the case at bar those conditions exist and concludes that therefore it is a case of alluvion. But it omits a condition, which because it is so obvious, it is implied in the discussion of Santamaría and that is that land to be adjudicated by right of accession cannot be, at any previous time, the property of another. If it belongs to another, as in the present case, there is no juridical alluvion by virtue of § 309, as we already explained.

Typically, as it happens when a case is approached exclusively from an analytical standpoint, the majority opinion does not go into the merits of the case. (Is the land occupied by defendant the property of someone else? Under § 302, is someone dispossessed of his property? Is that just and reasonable?) The opinion hinges on one word: the word "gradually" used in § 302. It is not the specific factual situation of the case what seems important, the "important and controlling" fact, says the majority opinion, is that the process be "gradual." I believe that such an interpretation of said section is erroneous. The law does not require that the change of course by a river that isolates a portion of land be *sudden* or *gradual*. A river may change its course at different degrees of speed. Whether the *isolation* of the portion of land be slow or rapid, its owner retains his ownership, § 309. The alluvion, wherever it takes place and forms the *res nova* (which is not the case at bar), shall be gradual because sedimentation is slow by its very nature. The decisive criterion is not, therefore, whether the separation of the portion of land from the main property was rapid or slow, but (1) whether the *res nova* was formed by alluvion (in which case juridical alluvion would take place) or (2) whether what occurred was separation from the main prop-

erty (in which case the owner of the separated parcel retains his ownership).

What I propose is that those sections of the Civil Code and of the Law of Waters be construed *as a whole* and that their purpose be borne in mind. In construing § 302 apart from the rest of the sections of that chapter of the Civil Code, the Court, in my opinion, reaches an erroneous conclusion. As HOLMES would say, "It is a fallacy to break the fagot stick by stick." *Schlitz Brewing Co.* v. *Houston Ice & Brewing Co.*, 250 U.S. 28, 29 (1919).

Unfortunately, in my opinion, the Court, as if drawn by the magic of the word "gradually" took the path that led it to one of those pitiless decisions of which Justice Cardozo spoke. Since in Cardozo not only the Law but also the English language reached one of its summits, I shall not try to translate the paragraph (into Spanish)■ and I quote:

"Judges march at times to pitiless conclusions under the prod of a remorseless logic which is supposed to leave them no alternative. They deplore the sacrificial rite. They perform it, none the less, with averted gaze, convinced as they plunge the knife that they obey the bidding of their office. The victim is offered up to the gods of jurisprudence on the altar of regularity ... I suspect that many of these sacrifices would have been discovered to be needless if a sounder analysis of the growth of law, a deeper and truer comprehension of its methods, had opened the priestly ears to the call of other voices. We should know, if thus informed, that magic words and incantations are as fatal to our science as they are to any other." [17]

Because of the reasons above stated I believe that this is not a case of accession by alluvion but a case in which a portion of land was separated from the main property by the river and the owner should retain his property, pursuant to

---

[17] CARDOZO, *Growth of the Law* 66; also in Selected Writings of Benjamin N. Cardozo 215 (ed. by Margaret E. Hall, 1947).

the provision of § 309 of the Civil Code which is also the just and reasonable thing to do.

I am authorized to state that Mr. Justice Ramírez Bages concurs in this opinion.